Alfred M. MASSEY, Appellant,

v.

WILLIAMS–McWILLIAMS, INC., et al.,
Appellees.

WILLIAMS–McWILLIAMS, INC., et al.,
Appellants,

v.

A. M. MASSEY et al., Appellees.
No. 26100.

United States Court of Appeals
Fifth Circuit.

July 28, 1969.

Rehearing Denied Aug. 20, 1969.

W. P. Macmurdo, Baton Rouge, La., Percy, Macmurdo & Gray, Baton Rouge, La., for Alfred M. Massey, appellant.

Rufus C. Harris, Jr., Benjamin W. Yancey, E. Burt Harris, Christopher Tompkins, Brunswick G. Deutsch, New Orleans, La., for appellees and cross-appellants; Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY, Circuit Judge and TAYLOR, District Judge.

**JOHN R. BROWN, Chief Judge.**

█ In this claim under the Jones Act, 46 U.S.C.A. § 688, and the general maritime law, the Trial Court held the vessel to be seaworthy and the Shipowner-Employer[1] free of negligence and accordingly denied relief of any kind to the Seaman-Appellant for an injury judicially admitted to have occurred.[2] We can, and do, credit fully the Trial Judge's findings of fact insofar as they relate to the physical conditions and the causal mechanism of the accident, but we reject, either as clearly erroneous if a fact finding or as an error of law if a conclusion of law, the ultimate holding that there was no negligence on the Shipowner's part in undertaking the transfer of crew members to an awaiting crewboat tied up alongside the derrick barge while the tow was underway. Between Shipowner and Seaman, we reverse and remand. We affirm denial of recovery by Shipowner against the impleaded owner of the crewboat.

It greatly simplifies the matter to emphasize from the beginning that the Trial Judge's error came from his almost total preoccupation with the seaman's explanation that he slipped and fell because of diesel oil on the deck of the crewboat—a condition which the Judge, with ample Rule 52(a) buoyancy, held to have been non-existent.[3] Mes-

---

1. Williams-McWilliams, Inc. Although the barge was owned by Humble Oil & Refining Co., it was under bare-boat charter to Williams-McWilliams, Inc., who is therefore treated as Shipowner pro hac vice. See Stevens v. Seacoast Co., 5 Cir., 1969, 414 F.2d 1032. See generally G. Gilmore & C. Black, The Law of Admiralty 215–19 (1957).

2. Presumably on the basis of the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1333(c), making applicable the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., the Shipowner-Employer made voluntary payments of $70 a week for approximately 50 weeks, totaling $3500. The Shipowner, as an anchor to windward, seeks to recover these on the ground that Massey, as a seaman, was not entitled to these benefits and should not be allowed to retain them. We discuss this later.

3. Illustrative of this preoccupation is the colloquy between Court and counsel on the suggestion that an expert be called to support the seaman's case:

"THE COURT: What is the purpose of the expert? What do you want to prove by the expert in this case? This case has only one point involved and that is whether or not there was oil on the deck which caused this man to slip, because I think there is absolutely no question about everything else being immaterial. So, what would an expert's testimony have to do with whether or not there was oil on the deck?
"MR. MACMURDO: Well, with all due deference to your Honor's opinion, I am sure you feel that way—
"THE COURT: I feel that way from the evidence. I asked the plaintiff specifically did he have any difficulty getting on the crewboat and he said no. And I asked him what caused him to slip and he told me oil on the deck. He said it was oil on the deck very very specifically and that seems to be the issue involved."
In his findings of fact the Trial Judge stated:
"Plaintiff stated several times during his testimony that the sole and only

merized—so it almost appears—by this claim and its collateral implications, which focused attention on the fitness and action of the crewboat, the Judge seemed to ignore the basic nature of the case—the duty of Shipowner to afford a safe ingress and egress to crew members coming aboard or leaving the derrick barge.

The injury occurred while the seaman was attempting to leave the DB-1, a derrick barge approximately 300 feet in length, 90 feet of beam, and with a depth of 19 feet. On September 7, 1965, the DB-1 was being towed from Block 115 of the Ship Shoal area to the Grand Isle area off the coast of Louisiana in the Gulf of Mexico. At the time of the accident she was 25 miles offshore proceeding about 3 miles per hour in an easterly direction before an easterly breeze of 15 to 20 miles per hour with the seas running at four to six feet. Under an arrangement between Shipowner and the crewboat operator, the crewboat *Chickcharney,* described in the trade as an Equitable Water Taxi (54 feet in length, 14 feet of beam), came alongside the DB-1. She regularly made a trip about 7:00 a.m. and 3:00 p.m. each day to the DB-1 for the purpose of transferring personnel to and from the barge.

On this occasion she came along the starboard side of the DB-1 and moored by use of bow and stern lines with her port quarter adjacent to the starboard bow ladder of the DB-1. This ladder was constructed of 6-inch angle irons welded to the side of the vessel with pieces of pipe welded to the angle irons to form the rungs of the ladder, the rungs of the ladder being 6 inches out from the side of the vessel. On each side of the ladder there is a 10-inch timber extending from the top to the bottom of the ladder so that when the crewboat or other vessel comes alongside it hits against the timbers leaving a 4-inch space between the boat and the rungs of the ladder. The ladder runs from the deck of the DB-1 to the water level.

The Seaman-Appellant was the first of 17 men to transfer from the DB-1 to the crewboat. As he described the transfer operation, the seas were running 4 to 6 feet and it was necessary to time the movement so that the railing around the afterdeck of the crewboat was nearly level with the rung of the barge ladder, at which moment the person would step or jump onto the railing of the crewboat and then down to the afterdeck some 2½ to 3 feet below the level of the railing. When he either jumped or stepped from the DB-1 ladder to the crewboat and then landed on the afterdeck of the crewboat, his feet went out from under him and he fell. He got up once or twice only to fall again. As we have stated before, there is no doubt that the seaman thought that it was diesel oil left on the afterdeck from an earlier fueling that caused his feet to slip out from under him as he hit the deck. Disregarding that rejected claim, we note that it remains uncontradicted that the afterdeck of the crewboat was wet from seawater resulting from the usual spray from her trip to the DB-1.[4]

■ Although there is a great deal of controversy in the record, in the Judge's memorandum opinion of findings and conclusions, and in the briefs, it is now

cause of his fall was the presence of oil, which he did not see, on the deck of the CHICKCHARNEY. He has completely failed to carry the burden of proving this assertion. The evidence is overwhelmingly against him."
[Finding of Fact No. 15].
Further, in another finding:
"* * * The Court finds, as a fact, that the allegation of the plaintiff that there was oil on the deck of the CHICK-CHARNEY which caused him to fall is only a personal conclusion of his, based upon a simple assumption, supported by no evidence whatsoever."
[Finding of Fact No. 16].

4. Indeed, the District Court, rejecting the claim of diesel oil on the afterdeck, found:
"The CHICKCHARNEY had been at sea for over two and a half hours with her decks awash immediately prior to this accident * * *."
[Finding of Fact No. 14].

clear that the Judge did consider both negligence and unseaworthiness, the latter as to both the DB-1 and the crewboat *Chickcharney*. We do not have to draw any refined lines, however, because we conclude that in the light of all the circumstances, i.e., the structure of the DB-1 and particularly the ladder arrangement, the condition of the seas, and the jury-rig procedure for getting from the DB-1 ladder onto the deck of the crewboat, Shipowner was negligent in failing to provide the crew with a reasonably safe means of egress.

After rejecting time and time again the claim of diesel oil on the afterdeck, the District Judge in sweeping terms concluded as a matter of law that the "plaintiff has failed to prove any negligence whatsoever on the part of the defendant, or any of its [Shipowner's] agents, employees, or representatives, either causing or contributing to the cause of the accident * * *." [Conclusion of Law No. 2]. He therefore put his imprimatur of fact or law or both on a patently, and unnecessarily hazardous transfer arrangement. With both the DB-1 and the crewboat under way, the crewboat unavoidably rising and falling in seas running 4 to 6 feet, and the DB-1's ladder structured in a manner that a person had to stand on a rung not lower than the rail of the rising and falling crewboat, the crewmen were required to step from the rung of the ladder onto the undulating rail and then jump down onto the wet afterdeck of the crewboat. This was held to be a perfectly acceptable course of action that put upon the seaman alone the risk of injury from this inevitable hazard of his calling.[5] His conclusion was apparently based on the facts that these were more or less normal operating conditions and that no one had ever been injured before in such a transfer.

We recognize, of course, that there are inevitable hazards—some of a very severe nature—in the calling of those who go down to sea in ships, hazards which when not occasioned by negligence or unseaworthiness have to be borne by those who follow the calling.[6] Nonetheless we hold that the implied conclusion—whether of fact or of law or more likely a mixture of both—that the transfer arrangements here satisfied the shipowner's obligation to furnish safe ingress and egress cannot pass muster. At least one simple expedient was open to ready use. For it was uncontradicted that the tow, heading directly into wind and seas, could have changed its heading sufficiently to afford a lee for the crewboat to make up along the starboard ladder. In obliquely rejecting this contention, the Judge simply recited the obvious physical fact that "[d]ue to the direction in which the DB #1 was being towed, i.e., head-on into the wind and seas, there was actually no lee or protected side for the Chickcharney to tie up to." He then went on to say that

---

5. In his conclusions of law the Judge stated that a shipowner "has every right to expect the seaman to cope with the ordinary hazards that simply must prevail even on a seaworthy vessel, Creppel v. J. W. Banta Towing, Inc., 202 F.Supp. 508 (D.C.E.D.La.-1962); Colon v. Trinidad Corp., 188 F.Supp. 97 (D.C.S.D.N.Y. 1960) * * *."
   [Conclusion of Law No. 5].

6. The common-law defense of "assumption of risk" is not available as a defense to an action under the Jones Act. See Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; The Arizona v. Anelich, 1936, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075. See generally M. Norris, The Law of Seamen § 685 (2d ed. 1962). Further, it has been stated:

   "The doctrine that the seaman assumes the 'ordinary risks' of his job in Jones Act cases is chimerical for it fails to state what should be obvious, viz., that the injury was not caused by the negligence of the employer and therefore the employee has not sustained the burden of his affirmative proof under the Jones Act."
   
   M. Norris, *supra* at 850. See also Lake v. Standard Fruit & S. S. Co., 2 Cir., 1950, 185 F.2d 354; Field v. Waterman S. S. Corp., 5 Cir., 1939, 104 F.2d 849, 1939 A.M.C. 1555; Repsholdt v. United States, 7 Cir., 1953, 205 F.2d 852, 1953 A.M.C. 1416.

from the evidence "it is clear that the condition of the wind and seas was not unusual and there were no conditions existing that called for the DB #1 changing course in order to form a lee. Personnel were transferred to and from the crewboat daily under the same or similar conditions, and there is no evidence whatsover to indicate that any change in course or speed of the DB #1 was required to transfer personnel from the DB #1 on September 7, 1965." [Finding of Fact No. 10].

But the record is uncontradicted that on occasion the skipper of the crewboat, if he felt conditions were unsafe, could request a change in course and the barge would be shifted to afford a lee. Of course, the responsibility for this was on the DB-1, not the crewboat. As a matter of fact, with no method of going from the DB-1 onto the crewboat other than stepping from the rung of the ladder on DB-1 onto the railing and then jumping down onto the afterdeck, which was and could be expected to be wet with seawater, the obligation was all the more imperative to reduce the hazards of this procedure by eliminating or reducing to the maximum reasonable extent the action of wind and seas on both vessels, and particularly on the crewboat alongside.

■ On the findings made by the Trial Judge and on the uncontradicted factual record, we conclude that under these circumstances Shipowner was negligent in failing to supply a reasonably safe egress for crew members. This has long been a fundamental duty of a shipowner. E.g., Superior Oil Co. v. Trahan, 5 Cir., 1963, 322 F.2d 234, 8 A.L.R. 3d 497, 1964 A.M.C. 100; Buch v. United States, S.D.N.Y., 1954, 122 F.Supp. 25, 1954 A.M.C. 1309, aff'd in part, 2 Cir., 1955, 220 F.2d 165, 1955 A.M.C. 713; Tate v. C. G. Willis, Inc., E.D. Va., 1957, 154 F.Supp. 402, 1957 A.M.C. 1859; Hatfield v. Brown & Root, Inc., E.D.Tex., 1965, 245 F.Supp. 733, 1965 A.M.C. 2754; cf. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503.

See generally Annot., 8 A.L.R.3d 505 (1966).

The judgment must therefore be reversed and the case remanded for a finding on damages. This makes it necessary for us to dispose of several collateral problems.

■ The first is the cross-appeal of Shipowner from the denial of relief against the impleaded owner of the *Chickcharney*. Of course, the Trial Judge could readily reach that result on the ground that no one had been found at fault, a conclusion which we have rejected. In many circumstances our holding would require a reversal for a trial in the light of the declared liability of Shipowner. In this case, however, we see no purpose in disturbing the dismissal of the third party impleader. We rest our reversal in the seaman's case entirely on the failure of the DB-1 to take appropriate steps by changing the course heading to afford a lee. This was a responsibility of Shipowner and those in charge of the DB-1. It cannot be palmed off onto the crewboat. If the arrangement was unsafe, and it obviously was, this was due not to the action of the *Chickcharney*, her owners, or crew, but to Shipowner who owed this nondelegable duty to its own crew members.

■ There is a tag end, however, since Shipowner seeks to recover from the seaman the compensation benefits erroneously paid under the Longshoremen's Act (see note 2 supra). Because the payments were made by the employer and not a third party, we are not faced with the usual problems of the collateral source doctrine. And, since the payments were made directly on behalf of the employer pursuant to a statutory scheme whose purpose it is to compensate at least to a degree the pecuniary loss as sustained by an employee from an injury received in the course of his work, we think it fair in the confusion of these ambiguous-amphibious controversies, Mike Hooks, Inc. v. Pena, 5 Cir., 313 F.2d 696, 697, 1963 A.M.C. 355, to require, not a repayment as such, but

rather a credit against those items of damages ultimately allowed that bear a reasonable relation to the items of loss compensated by workmen's compensation benefits. The items against which credit should be allowed would include (a) the ultimate award for maintenance and cure, (b) the pecuniary loss of wages during the period of payment of the compensation benefits, and (c) medical-hospital payments incurred up to the date of payment under the Compensation Act. No such credit is required as to the element of (d) pain and suffering—past, present, or future—or (e) loss of earnings or earning capacity subsequent to the date of payment of the last compensation benefit.[7]

The result is that between Shipowner and seaman, the case must go back for a trial on the issue of damages. On that issue, appropriate credits shall be allowed in accordance with this opinion.

Affirmed as to third party defendant; reversed and remanded.

---

**7.** *See, e. g.,* Smith v. Noble Drilling Co., Inc., E.D.La., 1967, 272 F.Supp. 321, 322, 1968 A.M.C. 640, aff'd., 5 Cir., 1969, 412 F.2d 952, A.M.C. Of course, as that opinion reflects, care must be exercised not to require a credit if the item (*e. g.,* medical expense) has not been included in the recovery. See also 45 U.S.C.A. § 55, which is incorporated into the Jones Act, 46 U.S. C.A. § 688.