Naven Joseph GUILLORY, Plaintiff,

v.

OCEAN DRILLING & EXPLORATION COMPANY, Defendant, Third-Party Plaintiff-Appellant,

v.

BLACK GOLD MARINE, INC., Third-Party Defendant-Appellee.

No. 29186.

United States Court of Appeals, Fifth Circuit.

Nov. 2, 1970.

Charles E. Lugenbuhl, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, James H. Daigle, New Orleans, La., for defendant, third party-plaintiff-appellant.

B. C. Bennett, Jr., Marksville, La., for plaintiff.

Christopher Tompkins, Charles M. Steen, Deutsch, Kerrigan & Stiles, New Orleans, La., for third party defendant-appellee; Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel.

Before BELL, THORNBERRY and CLARK, Circuit Judges.

PER CURIAM:

This appeal asserts that the district judge, as trier of fact in this maritime accident case, failed as a matter of law to give proper weight to the completely independent status which admiralty law accords to the master of every vessel in navigation. Further error is asserted in the failure to divide damages under the contract of indemnity in suit. Finding no error in the trial court's determination that the entire fault should be visited on the seaman's employer, we affirm as against both contentions.

Naven Joseph Guillory brought suit against Ocean Drilling & Exploration Company (Odeco) to recover for injuries

he sustained on October 3, 1967 while serving as a roustabout on Odeco's drilling barge, the MARGARET. Odeco denied liability to Guillory and filed a third-party complaint against Black Gold Marine, Inc., a corporation which contracted to furnish crewboat services to Odeco drilling rigs. The basis of the third-party complaint was an indemnity clause in the contract between Odeco and Black Gold, a claim of negligence and a claim for breach of implied warranty of workmanlike performance. Guillory amended his original complaint to name Black Gold as an additional defendant, charging them with negligence and charging their crewboat, SWORDFISH, with unseaworthiness.

■ Guillory and Odeco settled their differences before trial. Guillory's claim and Odeco's third-party complaint against Black Gold were tried before the court without a jury. At the conclusion of this trial the court found in favor of Black Gold against both Guillory and Odeco. Our review of the record reveals that the district court's findings set forth below in substantially that court's language, are clearly supported by credible evidence.

Guillory was employed by Odeco as a roustabout on the MARGARET a submersible drilling barge. At the time of the accident giving rise to this action the MARGARET was in its raised position and under tow from one location to another off the Louisiana coast in the Gulf of Mexico. Black Gold was the owner and operator of the SWORDFISH, a 59-foot crewboat used to furnish services to various drilling rigs owned and operated by Odeco pursuant to written agreement between those parties.

On the afternoon of October 3, 1967, as the SWORDFISH was on her way out to the MARGARET to deliver drilling equipment—stabilizers—which had been called for by Odeco, her master radioed ahead to the MARGARET to request that a crane operator be available to off-load the stabilizers. At this time the MARGARET was lying in a north-south position, with her derrick end toward the south. The wind and sea were coming from a southeasterly direction. The MARGARET is equipped with a crane on each side of the rig, both of which are suitable for off-loading equipment from a boat alongside. The starboard crane is more accessible to the crane operator, however, and the crane operator who was on duty on this occasion testified that he preferred to use the starboard crane because of its convenience. Those aboard the MARGARET acknowledged the SWORDFISH's request and told the SWORDFISH to come up on the east side of the rig to be unloaded by the starboard crane. The master of the SWORDFISH protested and informed the MARGARET that he would prefer to unload on the west side since it appeared to be too rough to unload on the east, or windward, side. The master of the SWORDFISH later testified that it appeared that it would be difficult for him to control his vessel if he backed under the starboard crane, since the wind and sea would strike his bow and would tend to force him downwind. He testified that, on the other hand, he would have no difficulty on the west side since he would then have his stern into the wind and sea.

Notwithstanding the protest of the SWORDFISH the MARGARET instructed the SWORDFISH to come up on the east to be unloaded by the starboard crane. The SWORDFISH then replied to the effect that she would make one attempt to see if the operation could be performed from that side. Plaintiff also protested, when he was instructed to go down on the personnel basket, that it was dangerous to perform the operation from the starboard crane and suggested that the SWORDFISH be unloaded from the other side of the rig with the port crane. Notwithstanding plaintiff's protests, he was told that the starboard crane would be used and he was instructed to proceed.

The SWORDFISH came alongside the MARGARET and backed in so that her

stern was under the personnel basket which, by then, had been lowered by the starboard crane of the MARGARET, with plaintiff in the basket. As soon as the basket got to the deck of the SWORDFISH, plaintiff stepped off and the MARGARET's crane operator signaled to him to load the stabilizers into the basket. The testimony established that it is customary to unload heavy equipment, such as the stabilizers here involved, by means of choker slings. The procedure is for the choker slings either to be sent down in the personnel basket with the roustabout, or sent down after the roustabout is landed on the boat. The personnel basket is unhooked and the choker sling attached to the crane fall. The slings are then made up to the equipment and it is taken up to the rig by the crane. The Odeco toolpusher (supervisor) aboard the MARGARET testified that it was not Odeco's practice and, in fact, was against Odeco's regulations to unload such equipment by taking it up in a personnel basket.

Due to the wind, sea and current the SWORDFISH began drifting from under the crane. Her master began to signal to the crane operator to take the basket up and Guillory removed a stabilizer which he had loaded or partially loaded, into the basket. Instead of picking the basket up, however, the crane operator continued to slack off on the crane fall so that the basket fouled a stern bitt on the SWORDFISH. This had the effect of tying the SWORDFISH to the rig's crane. The master of the SWORDFISH saw that he would have to get the basket off the boat or be set into the towing cables of the drilling rig by the drift. He told his deckhand and plaintiff to throw the basket overboard. It was while engaged in this operation that plaintiff injured his back. Despite the injury, the basket was thrown overboard and the SWORDFISH was able to maneuver out from the rig. She then proceeded to the west side of the MARGARET and the cargo was unloaded in routine fashion, without further incident.

The testimony and evidence on the state of wind and sea varied. However, the court found that the condition of the sea and, more especially, the wind, was such that the MARGARET should have allowed the SWORDFISH to initially off-load from the west side of the rig and not insisted upon its unloading from the east side. Had the off-loading operation proceeded in the normal way, i. e., by use of choker slings to off-load the equipment, the SWORDFISH may well have been able to compensate for the effect of the wind and sea on her bow. At any rate, the attempt could have been made without danger to personnel or property. Leaving the personnel basket, still attached to the crane fall, on the deck of the SWORDFISH, however, and then slacking the fall so that the basket became entangled with a bitt on the stern of the SWORDFISH, placed the SWORDFISH in a perilous situation by severely restricting her maneuverability. Moreover, it created the need for emergency action which plaintiff claims injured his back.

Based upon these findings of fact, the district court concluded that the SWORDFISH was without fault in connection with the accident and that the two proximate causes of Guillory's injuries were the negligent insistence of those in charge of the MARGARET that the crewboat off-load from the east side of the drilling rig, and the negligence of the MARGARET's personnel in the actual conduct of the unloading operation. The court thus denied recovery under any theory of negligence or implied or express warranty.

In this court, Odeco asserts that the court failed to consider the independent status of the SWORDFISH and the maritime independence of its captain, who could have refused to undertake any hazardous maneuver. They also criticize the fact that once the captain undertook the east side transfer, he was at fault in permitting his vessel to drift in relation-

ship to the moving drilling rig. With these contentions in mind, we have reviewed the evidence before the trial court and conclude that its findings of fact are supported by the evidence.

■ It is true that we have characterized the master of every vessel in navigation, regardless of how small, as the "lord of his little world". United Geophysical Co. v. Vela, 231 F.2d 816 (5th Cir. 1956); Stevens v. Seacoast Co., Inc., 414 F.2d 1032 (5th Cir. 1969). But it must be borne in mind that here there were two vessels in navigation, each with its own lord and master. It was the master of the MARGARET who had the primary responsibility for safely transferring the necessary personnel to the crewboat and effecting the off-loading of equipment. Massey v. Williams-McWilliams, Inc., 414 F.2d 675 (5th Cir. 1969). Thus we cannot say that, as a matter of law, the captain of the SWORDFISH was negligent in attempting to comply with the insistent demand of the MARGARET to make an attempt to effect a windward side loading operation. This is especially true in view of the finding of the trial court that the accident was partly caused by the failure of personnel aboard the MARGARET to follow their own standard procedure of using a choker sling to load equipment rather than the more cumbersome personnel basket.

Odeco argues that the captain of the SWORDFISH was negligent in cutting the power to the propellers of the crewboat after he came under the crane. While a review of the record does reveal testimony that the power to the propellers was off at times during the operation, a fair reading discloses that these were momentary actions which were part of normal and necessary maneuvering to bring the stern of the crewboat under the line of the crane from the drilling barge. Obviously if the crewboat had come alongside the moving barge and cut power to its propellers for any appreciable length of time without being attached to the barge, the crewboat would have quickly fallen astern.

Rather than this being the condition, all of the proof was to the effect that the wind had blown the bow of the crewboat so far forward along the much longer drilling barge's starboard side that the crewboat came dangerously close to fouling the lines of the towing tugs. There is substantial evidence in the record which supports the trial court's determination that the entire fault for Guillory's injuries was due to the negligence of those aboard the MARGARET.

Since we affirm the finding of the trial court that there was no negligence on the part of Black Gold, there can be no merit to the second assignment of error by Odeco—that United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), requires an apportionment of liability on the concept of comparative negligence.

Affirmed.