Robert G. HICKS, Plaintiff,

v.

CROWLEY MARITIME CORPORATION, et al., Defendants.

and

Charles BISHOP, Plaintiff,

v.

CROWLEY MARITIME CORPORATION, et al., Defendants.

and

Milton HILDEBRAN, Plaintiff,

v.

CROWLEY MARITIME CORPORATION, et al., Defendants.

Civ. A. No. H–79–1050.

United States District Court,
S. D. Texas,
Houston Division.

April 27, 1982.

Van E. McFarland and Brice A. Tondre, McFarland & Tondre, Houston, Tex., for plaintiffs.

Decatur J. Holcombe, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STERLING, District Judge.

This case came on for trial by the Court on January 25, 1982. Plaintiffs seek damages under the Jones Act and general maritime law for hearing loss sustained while employed aboard various Invader class tugboats owned and operated by Defendants. Plaintiff Hildebran additionally seeks damages and lost wages for a knee injury he sustained while so employed. Plaintiffs also seek punitive damages. The Court concludes that Plaintiffs failed to prove by a preponderance of the evidence that their injuries were caused by Defendants' negligence or failure to maintain seaworthy vessels. Based on the evidence adduced at trial, the Court makes the following findings of fact and conclusions of law.

### *Findings of Fact*

1. Plaintiff Robert G. Hicks, 49 years old, was employed by Defendants as a marine engineer for voyages aboard various Invader class tugboats from October 22, 1975, to November 22, 1978. During this period, Hicks spent approximately 616 days on voyages, the longest lasting 94 days. During a small part of this period, the vessels were in port and shut down, but during most of this period, Hicks was aboard the vessels while under way. On a normal day, Hicks' duties required him to be in the engine room about two hours a day for routine equipment checks and main-

tenance, and spot checks. When "making up" a tow, Hicks would usually be on the afterdeck near the winch motor. On occasion, Hicks would spend ten to twelve hours a day in the engine room to repair equipment. On one occasion, in April or May of 1977, Hicks was tapping an air pressure reduction value with a hammer when a "pop-off" valve in the air line blew trash particles into Hicks' right ear. Apparently as a result of this incident, Hicks went to an audiologist in August, 1977.

2. Prior to his service aboard Defendants' Invader class tugboats, Hicks had worked around or near delivery trucks, forklifts, aircraft engines, race car engines and cement equipment. Before or during high school, Hicks had measles, mumps and an infection in his right ear, perhaps from swimming. In 1956, Hicks had a second infection in his right ear, and took medication for it. In September, 1968, Hicks was hospitalized for contusions around his right eye, caused when he was thrown into his automobile windshield and knocked unconscious. Hicks went to sea in 1965 and spent most of his sea duty as an engineer working in the engine rooms of various vessels, mostly tugboats and supply vessels.

3. Plaintiff Charles Bishop, 39 years old, was employed by Defendants as a tugboat captain for voyages from January 2, 1977, to April 26, 1979, mostly aboard Invader class tugboats. During this period, Bishop spent approximately 539 days serving on Invader class tugboats, the longest voyage lasting 79 days. Bishop generally did not go into the engine room on the vessels he captained.

4. Prior to his service aboard Defendants' Invader class tugboats, Bishop had worked with hydraulic chipping hammers, diesel trucks, as a policeman directing downtown traffic, and with mortars, grenades and rifles in the National Guard. As a child, Bishop had measles and mumps.

Bishop went to sea in 1959 as a deckhand, left the sea in 1967, and returned in 1972.

5. Plaintiff Milton Hildebran, 37 years old, was employed by Defendants as a marine engineer for voyages on various Invad-

er class tugboats from June 8, 1978, to March 6, 1979. During this period, Hildebran spent approximately 180 days on voyages, the longest lasting 21 days. During a small part of this period, the vessels were in port and shut down, but during most of this period, Hildebran was aboard the vessels while under way. On a normal day, Hildebran's duties required him to be in the engine room about two hours a day for routine equipment checks and maintenance, and spot checks. When "making up" a tow, Hildebran would be on the afterdeck near the winch motor. On occasion, Hildebran would spend eight to twelve hours a day in the engine room to repair equipment. On December 16, 1978, Hildebran's left knee was cut when he tripped and fell while going down the ladder into the engine room. As a result of this injury, Hildebran missed 23 days of work.

6. Prior to his service aboard Defendants' Invader class tugboats, Hildebran had worked around or near band saws in a furniture factory, diesel truck engines, home power tools and outboard motors. Hildebran went to sea in 1966 and worked around or near the engine rooms of various vessels.

7. The Invader class tugboat has two 20 cylinder 3600 horsepower turbo-charged two-cycle diesel engines with a maximum 900 rpm. The Invader is about 136 feet long and 36 feet in breadth. From late 1974 to early 1977, Defendants accepted delivery of 25 Invaders, which were constructed throughout this period.

8. At Defendants' request, an acoustic and vibration consulting firm, Diehl and Lundgaard, Inc., made a noise survey of the Invader class tugboat. The Diehl and Lundgaard report was submitted to Defendants on May 23, 1975. According to the report, the dominant source of noise aboard Invader class tugboats is the engines, which transmit noise to other parts of the vessel by air and by vibration. Defendants decided to make efforts to reduce the noise level aboard its Invaders. As a guide, Defendants elected to use the noise level standards promulgated by the Occupa-

tional Safety and Health Administration (OSHA), although Defendants did not believe that noise level standards for vessels were an area within OSHA's jurisdiction. In 1975, the United States Coast Guard had not promulgated regulations governing noise levels in vessels and, as of the time of trial of this case in January, 1982, the Coast Guard was contemplating the publication of "recommendations," not regulations, in April, 1982. These recommendations are to be based on studies done for the Coast Guard which account for the requirement that seamen must work and live in their workplace.

9. During the construction of Invaders after May, 1975, Defendants had carpets and insulation pads put in the living quarters. Subsequently, Defendants added insulation to the tool room and engine room, added Fabreeka pads to the engine mounts in an effort to reduce vibration, used different types of engine mounting bolts in an effort to further reduce vibration, and added insulation to the bulkhead between the engine room and the engineer's quarters.

10. Sound is measured in decibels, which is a measurement of sound pressure or sound energy. A sound level measurement may be taken with the measuring meter set on a particular scale. The "A" scale filters out much of the low frequency noise, thus allowing a more precise measurement of high frequency noise, which is more harmful and annoying than low frequency noise. A decibel measurement using the "A" scale, or "dbA," provides the best single measurement of the harmfulness of noise.

11. The noise levels in the living areas of Invader class tugboats are consistently below 90 dbA. In 1975, OSHA regulations stated that sound levels below 90 dbA were not harmful to the unprotected human ear, regardless of the amount of time spent in that environment. The noise levels in the engine rooms of Invader class tugboats range from 105 dbA to 120 dbA. In 1975, OSHA regulations stated that exposure of the unprotected ear to 105 dbA should be limited to a maximum of 1 hour per work day, and exposure of the unprotected ear to levels above 115 dbA was not permitted. Defendants relied upon individual hearing protection, i.e. "ear muffs" or sound barriers which cover the ears, to screen out the harmful levels of engine room noise. The noise entering a protected ear in an Invader class tugboat engine room was below 100 dbA. In 1975, OSHA regulations stated that the human ear could be exposed to 100 dbA for up to two hours in a work day, and could be exposed to 95 dbA for up to four hours in a work day. Thus, in 1975 the noise levels aboard Defendants' Invader class tugboats met the existing OSHA standards for a chief engineer's normal work day. Although Defendants were not bound to follow the OSHA standards, the addition of insulation and provision of individual hearing protection on the Invaders demonstrates the degree of care and concern about harmful noise levels that a reasonable tugboat operator would have shown given the knowledge of tugboat noise levels and available means of protection known to the maritime industry in 1975. Defendants posted signs aboard their Invaders requiring hearing protection while in the engine room area.

12. There was a conflict in the testimony as to the availability of ear muffs aboard the Invaders while at sea. Plaintiffs testified that they wore hearing protection when available and that Defendants sometimes provided ear muffs to the engineer, but that often there were no ear muffs aboard or that the available muffs were cracked and deteriorated from heat and moisture. Defendants' testimony was that ear muffs were generally available aboard the Invaders, and that if none were aboard before a voyage began the chief engineer could request them from Defendants' supply, or borrow from another of Defendants' vessels. It is significant that Plaintiff Hildebran testified that ear muffs were usually available on his voyages aboard Invaders. The Court finds that individual hearing protection in the form of ear muffs and ear plugs was available aboard the Invaders while at sea. If ear muffs were lost or deteriorated, the Court finds that the chief engineer of each Invader could have se-

cured additional ear muffs with little difficulty from Defendants' supply or other vessels.

13. With the addition of insulation and vibration absorbers, and with the requirement that seamen wear individual hearing protection while in the engine rooms of the Invaders, Defendants' Invader class tugboats were reasonably fit for their intended use. Of course, the most desirable method of reducing harmful noise levels in tugboats would be at the design stage, with airborne noise and vibration reduced by engineering insulation and vibration absorbers into the vessel. However, the Invaders were designed before the maritime industry came to recognize that the harmful effects of excessive noise levels aboard vessels of all types were more than just an occupational hazard accepted by those who go down to the sea in ships. The proposed Coast Guard recommendations contemplate the use of individual hearing protection in lieu of making substantial design changes where the individual hearing protection is sufficient to prevent hearing loss. While the noise levels in Invader engine rooms are harmful, Defendants' choice of individual hearing protection instead of redesigning or retrofitting their vessels nevertheless prevents hearing loss, and thus the harmful engine room noise levels do not make the Invaders unfit for their intended use.

14. Exposure to a loud noise may cause a temporary loss of the human ear's ability to hear sounds at certain frequencies. If the ear receives sufficient rest between periods of exposure to loud noise, the hearing loss may be only temporary, and normal hearing should return. Continuous exposure to excessive noise will cause a shift in the ear's recovery threshold, thus causing permanent hearing loss from noise levels that would only produce a temporary loss in a rested ear. Hearing loss proceeds logarithmically with continued exposure to excessive noise. Permanent hearing loss may also be caused by diseases such as measles or mumps.

15. Plaintiff Hicks took an audiogram on August 4, 1977, about a year and a half after beginning his service as engineer aboard Defendants' Invaders. The 1977 audiogram shows a permanent bilateral hearing loss in the high frequency range. Plaintiff Hicks continued his service aboard Invaders for over a year after the 1977 audiogram. Plaintiff Hicks terminated his employment with Defendants in November, 1978. On June 13, 1979, Plaintiff Hicks took a second audiogram. Plaintiffs' expert, Martha Hablinski, testified that Plaintiff Hicks' two audiograms were about the same in regard to the type and degree of hearing loss. A third audiogram taken by Plaintiff Hicks later in 1979 is also consistent with the others. Hablinski testified that Hicks' audiograms reflect a hearing loss in the high frequency range around 4000 hertz, but there is an improvement at the higher frequency of 8000 hertz. Hablinski testified that the hearing loss reflected in Plaintiff Hicks' audiograms could have occurred in a period from three to six months, i.e., while Hicks was serving aboard Invaders before 1977. However, since the hearing loss reflected by the 1977 audiogram was permanent, a shift in Hicks' recovery threshold should have occurred and continued exposure to harmful noise levels should have resulted in a logarithmic increase in Hicks' high frequency hearing loss. Notwithstanding Hablinski's opinion that the hearing loss could have occurred while Hicks was serving aboard the Invaders, the Court finds that this evidence is also consistent with Defendants' contention that Hicks suffered no hearing loss caused by harmful noise levels aboard the Invaders. In light of Hicks' history, the Court can only speculate whether the Invaders' noise levels contributed in any way to Hicks' hearing loss.

16. Plaintiff Hicks' first audiogram was taken on August 4, 1977, about three months after the "pop-off" valve blew trash particles into his right ear. The 1977 audiogram indicates a bilateral high frequency loss, i.e., nerve damage to the inner ear in both right and left ears. Thus, the trash particles were not the cause of the injury. The maximum noise level of the "pop-off" valve was below 140 dbA, and this level of

sound might have caused Hicks to suffer a temporary hearing loss. The evidence regarding Hicks' permanent hearing loss suggests several possible causes for the loss, and the Court can only speculate whether the "pop-off" valve noise level contributed in any way to Hicks' hearing loss. Additionally, Plaintiff Hicks could have isolated the "pop-off" valve from the air pressure line before tapping the reduction valve with a hammer and thus could have avoided the "pop-off" of pressure by the exercise of reasonable care.

17. Plaintiff Bishop took an audiogram in June, 1981, over two years after ending his service aboard the Invaders. The audiogram shows a permanent high frequency range hearing loss in the left ear, with hearing in the right ear being close to normal. This evidence is not consistent with a hearing loss caused by continuous exposure to harmful noise levels and the Court can only speculate whether the Invaders' noise levels contributed in any way to Bishop's hearing loss.

18. Plaintiff Hildebran took an audiogram in December, 1981, over two and a half years after ending his service aboard the Invaders. During that two and a half year period, Hildebran worked as an assistant engineer aboard turbocharged tugboats, did preventive maintenance on diesel truck engines and did some repair work on outboard motors. The audiogram shows a permanent bilateral hearing loss in the high frequency range, with the high frequency range loss being more severe in the right ear. Hildebran testified that he wore hearing protection while working in the Invaders' engine rooms and with the tugboats and diesel engines after he left Defendants' vessels if hearing protection was available. Hildebran testified that hearing protection was usually available aboard the Invaders, but that the ear muffs were often uncomfortable and deteriorated. The Court has found that the engineer aboard each Invader could obtain ear muffs with little difficulty, and from an examination of the ear muffs the Court is persuaded that a seaman would experience only minor discomfort wearing the muffs while performing his duties in the Invader engine rooms. In light of Plaintiff Hildebran's admitted use of hearing protection, which the Court has found lowered the noise level entering a protected ear in an Invader engine room to under 100 dbA, and in light of Hildebran's prior and subsequent work history, the Court can only speculate whether the Invaders' noise levels contributed in any way to Hildebran's hearing loss.

19. Plaintiff Hildebran's knee injury was caused when he tripped while descending the engine room ladder. The Court finds that the water on the handrail did not contribute to the fall, and there was no evidence of grease on the stairs or rail or that the design or construction of the stairs caused the fall. Plaintiff Hildebran received maintenance and cure as well as medical expenses during the period of disability caused by the knee injury. Hildebran's knee injury occurred while his vessel was docked at a port in New Jersey, before a voyage began.

20. Any conclusions of law which may be deemed findings of fact are adopted as part of these findings.

### Conclusions of Law

1. The Court has jurisdiction over the parties and subject matter of this action.

2. The Occupational Safety and Health Act and the regulations promulgated by OSHA to enforce the Act do not apply ex proprio vigore to working conditions of seamen on vessels operating on the high seas. *Clary v. Ocean Drilling and Exploration Co.,* 609 F.2d 1120, 1121 (5th Cir. 1980). Defendants nevertheless conformed their conduct to the OSHA standard for maximum exposure to harmful noise levels. Of course, Defendants' compliance with the OSHA standard would not excuse their conduct if they failed in their duty of care under the Jones Act or failed to furnish a vessel and equipment reasonably fit for their intended use. The Court considered evidence regarding the OSHA regulations and the proposed Coast Guard recommendations because these materials contain information about the harmful effects of excessive noise on workers and seamen which

should have been known to Defendants and other vessel owners and because the OSHA and Coast Guard materials provide some evidence relevant to the question of what noise levels a reasonably prudent vessel owner would try to achieve on his vessels and what noise levels would make a vessel reasonably fit for its intended use.

■ 3. In causing a study to be made of noise levels aboard Invader class tugboats and in providing individual hearing protection and insulation in the engine rooms of Invaders, which protected Invader seamen from permanent hearing loss, Defendants performed their duty to provide their seamen with a reasonably safe place to work.

■ 4. With the use of individual hearing protection in the engine room and insulation, the work areas and living quarters of Invader class tugboats were reasonably fit for their intended use. Defendants do not have an absolute duty to eliminate all excessive noise aboard the Invaders, nor even an absolute duty to completely insulate their seamen from all excessive noise. Defendants have a duty to protect their seamen against permanent hearing loss. The discomfort of wearing ear protection and the occasional exposure to excessive noise which does not cause a permanent hearing loss are the inevitable hazards of sea duty. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); *Massey v. Williams-McWilliams*, 414 F.2d 675, 678 (5th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970).

■ 5. Plaintiffs' failure to follow Defendants' instructions to wear hearing protection was the sole cause of any hearing loss incurred by Plaintiffs while serving aboard Invaders. Although a seaman's duty to exercise reasonable care is slight, that duty is breached when a seaman fails to use proper equipment when such equipment is available. *Bobb v. Modern Products, Inc.*, 648 F.2d 1051, 1057 (5th Cir. 1981).

■ 6. The engine room ladder used by Plaintiff Hildebran when he suffered his knee injury was reasonably fit for its intended use. Defendants' negligence, if any,

in allowing water to accumulate on the handrail was not a contributing cause to the fall and injury.

■ 7. Since Plaintiff Hildebran's knee injury disabled him before the start of a voyage, Defendants are not liable to Hildebran for payment of wages during his disability. *Vickers v. Tumey*, 290 F.2d 426, 434 (5th Cir. 1961).

■ 8. Plaintiff Hicks' failure to isolate the "pop-off" valve from the air pressure line before tapping the reduction valve with a hammer was the sole cause of any hearing loss caused by the "pop-off" noise. Plaintiff Hicks failed to prove by a preponderance of the evidence that his permanent hearing loss was caused by the "pop-off" noise.

9. Defendants were not negligent. The Invader class tugboats were not unseaworthy.

10. Plaintiffs Hicks, Bishop and Hildebran failed to prove by a preponderance of the evidence that the permanent hearing loss of each was caused by the excessive noise levels aboard the Invader class tugboats.

11. Any findings of fact which may be deemed conclusions of law are adopted as part of these conclusions.