**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 02-40307**
_____

**ANTOINETTE HARRISON,**

**Plaintiff-Appellee,**

**versus**

**SEARIVER MARITIME, INC.,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**
**(G-01-CV-247)**
_____

January 28, 2003

Before SMITH, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

An employer/vessel owner and operator contests Jones Act liability for an injury allegedly suffered while its employee/seaman performed a routine task. Primarily at issue is whether the employer violated a Jones Act duty. **REVERSED and RENDERED.**

I.

Antoinette Harrison was born in 1960. After completing high school, she worked a number of jobs, including, but not limited to,

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

custodial, landscaping, and construction; the latter included work as a welder and bricklayer's helper.  Harrison's work regularly involved moderate to extensive labor and physical activities. Harrison is 5'2" and muscular; at the time of the alleged injury, she weighed approximately 180 pounds.

Harrison began as a seaman with Sabine Transportation Company in 1994, serving four years as a cook and steward aboard tankers. Frequently, she was required to use stairs while carrying loads. On a Sabine vessel in 1995, Harrison injured her right knee while carrying a crate up stairs:  she felt a pop and twitch in the knee; she did not suffer a misstep, blow to, or twist of the knee.  As discussed below, that injury and circumstances surrounding it are similar to the one at issue involving her other (left) knee.

Dr. Hayes, an orthopedist, treated this right knee injury.  He found Harrison had malalignment (lateral  tilting) and subluxation (slight dislocation) of *both* patellae (kneecaps).  He opined: Harrison's kneecaps do not glide properly in the groove in which they move during knee motion; and, because of these congenital abnormalities, Harrison is predisposed to kneecap problems and injuries.  Dr. Hayes also diagnosed chrondromalacia of the right knee, which he described as "sick" cartilage of the patellae, which becomes inflamed and causes pain when the misaligned kneecap does not glide smoothly in its groove during knee movement.

Following arthroscopic surgery to her right knee, Harrison returned to work at Sabine. In 1998, Harrison applied to defendant Seariver Maritime, Inc., for employment. She successfully passed a pre-employment physical, at which time she informed the Seariver medical director of her right knee surgery.

Harrison accepted entry-level employment with Seariver as a maintenance seaman in the deck department. After completing a two-week training course, Harrison was assigned to the NORTH SLOPE, an oil tanker owned and operated by Seariver.

Harrison boarded the vessel in May 1998; it was en route to a shipyard for a steel survey and inspection. For her daily work assignments, Harrison reported to Chief Mate Rauhut, who had sailed with Seariver and its predecessor since 1991. While en route, the crew prepared the vessel for the shipyard work, including covering the interior house decks with plastic protection and cleaning the cargo tanks for tank entry and inspection.

Harrison participated in the deck-covering on 10 through 14, and 17, June, performing this work on her hands and knees. Although she wore knee pads, both knees began hurting.

On 18 June, Rauhut assigned Harrison and Picou, a more experienced maintenance seaman than Harrison, the task of clearing discharge hoses and blowers from the main deck (18 June meeting). Harrison and Picou were advised to use a cart to move the blowers. Harrison did not request more specific instructions.

3

The blowers were to be moved to the forecastle (forward part of the vessel); the discharge hoses, one deck below (lower forecastle).  The hoses were a lightweight rubber (polypropylene); Rauhut had ordered what he termed "ultra lightweight" hoses that he described as similar in texture to a garden hose.  According to Seariver, the hoses were roughly three and one-half inches in diameter and varied in length from 50 to 75 feet, with a 50-foot hose weighing 20 to 30 pounds; Harrison thought they were longer (75 to 100 feet) and wider (as much as six to eight inches in diameter).

Following their 18 June meeting with Rauhut, Harrison and Picou began the assigned task.  After moving the blowers to the forecastle, they began moving the hoses to the lower forecastle — each hose was brought to a stairwell for transportation down a deck and then forward.  Harrison would take the front of each hose and proceed down the steps, holding the rail with one hand and carrying the hose over her shoulder.  Harrison estimated the weight she carried to be 15 to 20 pounds and testified that it increased as she descended.  Picou remained above and moved the hose forward, carrying the trailing end.  They moved eight to ten hoses to the lower forecastle without incident.

Harrison testified she felt a "pop" in her left knee while descending to the lower forecastle with the forward end of a hose. Consistent with her injury in 1995, she did not twist her knee; nor

4

was there any slip, trip, or other trauma. Harrison did not report the incident and continued working that day for an additional five or six hours. Picou knew of no injury to Harrison and did not observe her limping or being otherwise injured. (In fact, Picou did not even recall that it was he and Harrison who carried the hoses.) As work progressed with the hoses, Picou offered to switch places with Harrison; they did so.

After 18 June, Harrison continued to believe she had not been injured and did not report any accident or injury. She continued to work her regular assigned watches. After the vessel arrived at the shipyard, Harrison was transferred to the GALVESTON, another Seariver vessel, and worked her regular assignments there.

On 12 July, almost a month after the hose-storage, Harrison reported to the GALVESTON's master with complaints of pain in both knees, but particularly her *right* knee (the knee injured approximately three years earlier, while employed by Sabine, not Seariver). The GALVESTON injury report notes swelling and burning in the *right* knee and states: for location of injury, "unknown"; for activity employee engaged in when incident took place, "unknown"; for activity at time of incident, "noticed gradual swelling in knees over last several days"; for nature of injury, "swelling in *right* knee". (Emphasis added.)

The GALVESTON's medical logs confirm that Harrison was treated for her *knees* thereafter. (Those logs appear to have been altered

5

(an "s" added) to describe swelling in, and treatment for, *knees*, rather than a *knee*; however, this is not at issue.)

In July 1998, the GALVESTON remained in port; Harrison received treatment ashore for *both* knees. On 28 July, an MRI was performed on Harrison's *left* knee.

That August, Harrison again saw Dr. Hayes (as discussed earlier, he had treated her right knee in 1995), who prescribed medication and physical therapy. Harrison reported to Dr. Hayes that her symptoms "started about a month ago after she pulled some heavy hoses on a large ship at work". Hayes determined: Harrison's left kneecap was malaligned (tilting laterally) and partially subluxated (dislocated); and she had chrondromalacia in that knee (as he had diagnosed for her right knee in 1995).

For her left knee, Harrison had arthroscopic surgery, physical therapy, and work hardening. The knee continued to be unstable, and Dr. Hayes referred Harrison to an orthopaedic specialist, who performed a second surgery. Since then, she has undergone physical therapy and received additional medical treatment. (Seariver paid, and Harrison does not seek recovery for, these past medical expenses.) Harrison has remained off duty; her condition probably will prevent her from working as a seaman.

Harrison filed this action in 2001, alleging she injured her *left* knee while moving hoses for Seariver on or about 18 June 1998. Harrison claimed negligence under the Jones Act (46 U.S.C. § 688),

6

unseaworthiness under general maritime law, and entitlement to maintenance and cure.

A one-day trial was held in late 2001. Pursuant to findings of fact and conclusions of law entered in early 2002, the district court held for Harrison on the Jones Act claim but dismissed her other claims. Among other rulings, it found Seariver breached a duty to Harrison because the hose-clearing procedure was not safe. Ninety percent negligence was assessed Seariver; ten percent, Harrison. She was awarded, *inter alia*, approximately $550,000.

## II.

Regarding Jones Act liability, Seariver contends: it did not violate a duty; and Harrison did not prove Seariver's negligence, if any, was the legal cause of her injury. (In addition, Seariver challenges several evidentiary rulings and also claims the district court reversibly erred in the damages awarded, including undiscounted future losses, a double award of economic loss during the interval between the date of the alleged injury (18 June 1998) and trial (14 November 2001), prejudgment interest on future damages, and an award of fringe benefits without the requisite evidence. Because, as discussed *infra*, Seariver did not violate a Jones Act duty, we do not reach the other issues.)

Conclusions of law are reviewed *de novo*; findings of fact, only for clear error. *E.g., **Dow Chemical Co. v. M/V Roberta Taylor***, 815 F.2d 1037, 1042 (5th Cir. 1987). "A finding is clearly

7

erroneous when after studying the record, [we are] left with the definite and firm conviction that a mistake has been committed." *Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001) (internal citations omitted).

Rulings on breach of duty and causation are considered *findings of fact*, reviewed for clear error. *E.g., Chisholm v. Sabine Towing & Transportation Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982); FED. R. CIV. P. 52(a). Rahout and Picou, two of the three most important witnesses in this case, testified by deposition. Nonetheless, the clear error standard applies to *all* findings of fact, including those based on documentary evidence. FED. R. CIV. P. 52(a) (as amended in 1985). As discussed *infra*, the breach of duty finding was clearly erroneous.

The Jones Act provides: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law...." 46 U.S.C. § 688. Under the Act, the employer is liable if its *negligent* breach of duty caused, in whole or in part, the seaman's injury. *E.g., Hopson v. Texaco, Inc.*, 383 U.S. 262 (1966). Seariver maintains it did not breach a duty to Harrison. Again, the breach of duty finding is reviewed for clear error.

The Jones Act standard of care, applicable to both employers and seamen, is ordinary prudence under the circumstances. *E.g., Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir.

8

1997) (en banc). This standard is designed to be very light; because seamen are considered wards of admiralty and the court, the Jones Act is interpreted broadly for their protection. *See, e.g.*, **Socony-Vacuum Oil Co. v. Smith**, 305 U.S. 263, 266 (1939). On the other hand, a Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of injury does not establish liability. *E.g.,* **Marvin v. Central Gulf Lines, Inc.**, 554 F.2d 1295, 1299 (5th Cir.) ("the burden of proving negligence ... in a Jones Act case is a light one, but even at sea injury does not presuppose negligence"), *cert. denied*, 434 U.S. 1035 (1978). *See also* **Consolidated Rail Corp. v. Gottshall**, 512 U.S. 532, 544 (1994); **Chisholm**, 679 F.2d at 62.

Harrison claimed (and the district court found) Seariver was negligent. In essence, the district court based its negligence findings on the hose-clearing method not being safe. Included in the findings was that the hose should have been lowered, not carried, down the stairs. In this regard, Harrison maintains Seariver failed to exercise ordinary care in three ways: (1) it allowed two seamen, one of whom it knew was inexperienced, to carry lengthy hoses down steep stairs, when they should have been lowered down (*i.e.,* "fed down"); (2) because Seariver did not conduct a job hazard assessment as required by its safety manual, it failed to evaluate safer alternatives for moving the hoses down the stairs;

9

and (3) it required repetitive stair-use by Harrison while carrying a load, which its own safety manual proscribes.

As noted, notwithstanding the deferential standard of review and our mandate to broadly interpret the Jones Act, and based upon our review of the record, the negligence finding was clearly erroneous. In sum, Seariver did not violate its duty to exercise reasonable care with respect to workplace safety.

Because a Jones Act employer is not an insurer of its employee's safety at sea, the employer is not liable when an injury arises solely from the ordinary and normal activities or risk of seamen's work in absence of proof that the injury complained of was caused by the employer's negligence. *E.g.*, **Chisholm**, 679 F.2d at 62; **Massey v. Williams-McWilliams, Inc.**, 414 F.2d 675, 678 (5th Cir. 1969), *cert. denied*, 396 U.S. 1037 (1970). "[T]here are inevitable hazards – some of a very severe nature – in the calling of those who go down to sea in ships, hazards which when not occasioned by negligence ... have to be borne by those who follow the calling". **Massey**, 414 F.2d at 678. An employer simply is not required to protect (indeed, cannot protect) its employees from all types of injuries. *See* **Gavagan v. United States**, 955 F.2d 1016, 1019-21 (5th Cir. 1992). Harrison's knee problems cannot be attributed to any negligence by Seariver.

A.

No duty was breached by Seariver's allowing two seamen, including one relatively inexperienced seaman, to carry, instead of lower, hoses down stairs.

First, this task was routine and certainly not hazardous; moving shipboard equipment is a common and expected physical task. Ordinary prudence is exercised when a safe procedure is used for a routine task, even when a safer procedure might exist. *See, e.g.*, **Ruberry v. United States**, 93 F. Supp. 683, 685 (D. Mass. 1950) (that "a better tool and a better method" might have been employed did not aid seaman where no showing that "tool or method actually used ... was unsafe or unsuitable"). *Cf*. **Marshall v. Ove Skou Rederi A/S**, 378 F.2d 193, 201 (5th Cir.) (no duty to provide best, most modern gear, so long as gear provided was reasonably suitable), *cert. denied*, 389 U.S. 828 (1967).

Critically, although Harrison points to testimony (including Rauhut and Picou's depositions) that lowering the hoses would have been *safer* than carrying them, there is no evidence in the record that the latter method was *unsafe*. This was corroborated by the expert testimony.

Seariver's liability expert, Captain Marsh, had significant, relevant experience, having spent 25 years in the Merchant Marine, the last 12 being spent on tankers as a chief mate or master. He had personally supervised tank-cleaning activities and the stowing

12

of tank-cleaning equipment. Moreover, he inspected the NORTH SLOPE and the hoses at issue.

Marsh testified that there were two proper ways to move a tank-cleaning hose down a stairwell into a storage area: using two seamen to carry the hose down the stairs; and lowering it. He opined: either way is acceptable; and carrying the hose is a routine method for accomplishing the task.

Harrison's liability expert, Kuykendall, had never sailed on tankers as a master or chief mate, had never been involved in tank-cleaning operations aboard tankers of any kind, had no hands-on experience with discharge hoses used in tank-cleaning activities, had never been aboard the NORTH SLOPE, and *had never inspected the hoses Harrison was carrying*. In any event, Kuykendall's testimony (*e.g.*, "I don't think [carrying the hose is] the smart way to do it ... "; "I personally would have fed [the hoses] down to the main deck ... without anyone being underneath the load") again only indicates that lowering the hoses was a *better* method, not that carrying them was *unsafe*.

The record is devoid of evidence that would support negligence under the circumstances. For example, nothing indicates the manpower assigned to this task was inadequate. *See* **Bommarito v. Penrod Drilling Corp**., 929 F.2d 186 (5th Cir. 1991) (duty to assign sufficient manpower to safely complete task). Rauhut and Marsh

13

testified that, at most, two seamen were required for the job to be performed safely.

Second, nothing in the record supports the job's being too difficult or complicated for someone of Harrison's experience level. *See **Johnson v. Offshore Exp. Inc.***, 845 F.2d 1347 (5th Cir.) (may be negligent to assign task inappropriate for experience level), *cert. denied*, 488 U.S. 968 (1988). By her own admission, Harrison had experience in carrying loads on stairs from the four years she spent as a cook and steward aboard Sabine's tankers; and she had years of experience in positions demanding physical labor. Picou, the co-worker assigned to assist Harrison, had more experience working as a sea maintenance worker than Harrison, and could direct her, if needed. Additionally, regarding physical strength, Harrison was not ill-equipped for the task; she testified: the weight on her shoulder was approximately 15 to 20 pounds; and she was a muscular, 180-pound seaman.

Finally, there was no failure to warn Harrison of any unsafe condition, nor did one exist. *See **Price v. S.S. Yaracuy***, 378 F.2d 156 (5th Cir. 1967). The NORTH SLOPE, a modern vessel, was in calm waters at the time of the alleged injury. As Harrison testified: the vessel was well-maintained; the stairs were properly built and maintained; lighting was adequate; hand rails and non-skid surfaces were available for her protection; and the stairs were stable. (In

14

this regard, the district court "conclude[d] that the vessel was in all respects seaworthy".)

B.

With respect to the alleged failure to conduct a job hazard analysis (JHA) as required by Seariver's safety manual, that manual was adopted by Seariver to ensure the safety of its vessel and crew. It does not (as Harrison seems to suggest) establish Seariver's legal duties. To so hold would discourage vessel owners from adopting the most stringent safety procedures (*i.e.*, procedures that go beyond "ordinary care"), to the detriment of seamen and their safety. On the other hand, Seariver's failure to abide by its safety regulations (*e.g.,* failure to perform a JHA where one was required), would be *relevant* in determining whether the vessel owner or its employees failed to exercise ordinary care.

Contrary to the district court's finding ("both the Chief Officer and Picou concede that no Job Hazard Assessment was done whatsoever"), the record *does not establish* that Rauhut failed to conduct a JHA. On the one hand, Harrison testified that no JHA was performed. On the other, it is undisputed that Rauhut met with Harrison and Picou the morning of 18 June to discuss the blower and hose removal assignment. Rauhut testified that a JHA *was* then performed, and that he would have told them to use: (1) "a couple of people" to take the hoses; and (2) handtrucks to move the blowers (which weighed 40-50 pounds). Picou also testified that a

15

JHA was performed, and this testimony is corroborated by the daily work log for 18 June: "0800 M/S Toni & Don [Harrison & Picou] put away blowers & hoses on deck. Blowers to forward end for rinsing. Two person lift use cart. *JHA held*." (Emphasis added.)

Although she disputes the timing and content of the JHA, Harrison now concedes one was performed. She insists there was no *written* JHA and urges that the JHA did not address hose-removal. The safety manual states, however, that, at least for *routine tasks* (such as the one at issue), a JHA can be either oral or written. Moreover, a JHA's purpose is to identify hazards and minimize risks; it need not (and cannot) cover every aspect or contingency. *See generally* **Gavagan**, 955 F.2d at 1021 (no legal duty to protect against all types of harm, especially where harm neither foreseeable nor unreasonable).

Even accepting Harrison's contention that a specific JHA was not performed with respect to the hose-removal, the failure to conduct a JHA nonetheless does not support finding negligence, because Seariver's safety manual does not require a JHA *for this particular task*. Harrison insists that such a JHA was required, contending Seariver's safety manual mandates a JHA where the task: involves movement of bulky items, especially where seamen are unfamiliar with the work procedures to be used; or requires sequential steps.

16

The manual *does not require* a JHA for routine, non-complicated jobs (again, such as the one at issue).  Moreover, whether a JHA is required is left to the supervisor's discretion, with the manual *suggesting* JHAs for jobs that:  have the potential for serious consequences; are accomplished through a number of sequential steps; are repetitive, with employees repeatedly exposed to hazards; are new, or have been modified; or have resulted in incidents.  In short, a JHA was not required by the safety manual for the routine, simple task of clearing the deck of hoses and storing them.  (According to the safety manual, the *employee* also has a responsibility to "identify tasks [she is] unfamiliar with or do[es] not fully understand, discuss them with [her] supervisor, and conduct a JHA".  Harrison concedes she did not seek any further instruction from either Rauhut or Picou with respect to carrying the hoses, although she could have done so, nor did she suggest doing a more specific JHA.)

More to the point, there is no requirement at law that a JHA be conducted, especially for routine tasks.  (Along this line, the phrase "job hazard analysis" originates in Seariver's safety manual, not the Jones Act.)  In other words, failure to conduct a JHA for this routine, non-hazardous task did not violate Seariver's duty to exercise ordinary care.  Nothing indicates that Rauhut's supervision or instructions were inadequate.  Any implicit finding to the contrary constituted clear error.

17

## C.

Regarding Harrison's claim that Seariver was negligent in requiring her to perform repetitive stair-use while carrying a load (in contravention of its safety manual), we reiterate that the safety manual, while relevant, does not state Seariver's legal duty. Moreover, although the manual notes that excessive stair climbing has been associated with leg and knee fatigue, it does not define "excessive". It states: "unnecessary" stair climbing should be avoided; and repetitive climbing "over prolonged periods of time" should be accompanied by rest breaks, if needed.

The record does not demonstrate that Harrison's stair-use was unnecessary, excessive, or over a prolonged period of time. Nor does it suggest Harrison was unable to take breaks as needed.

## III.

For the foregoing reasons, finding Seariver negligent constituted clear error. Accordingly, the judgment is **REVERSED** and judgment is **RENDERED** for Seariver.

*REVERSED and RENDERED*

18