The NEIMAN–MARCUS GROUP, INC., Plaintiff–Appellant,

v.

David DWORKIN, Defendant–Appellee.

David DWORKIN, Plaintiff–Appellee,

v.

CARTER HAWLEY HALE STORES, INC., et al., Defendants,

Neiman–Marcus Group, Inc., Defendant–Appellant.

No. 89–7107.

United States Court of Appeals, Fifth Circuit.

Dec. 19, 1990.

**1.** 251 N.L.R.B. 425 (1980) (supplemental decision and order).

**2.** 271 N.L.R.B. 1238 (1984).

**3.** 240 N.L.R.B. 813 (1979).

Stephen F. Fink, Steven W. Sloan, Thompson & Knight, Dallas, Tex., for plaintiff-appellant.

Jennifer B. Altabef, Locke, Purnell, Rain, Harrell, Dallas, Tex., Bruce S. Sperling, Mitchell H. Macknin, Sperling, Slater & Spitz, Chicago, Ill., for defendant-appellee.

Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.

REAVLEY, Circuit Judge:

David Dworkin sued his former employer, Neiman–Marcus, for breach of his employment contract. Dworkin recovered judgment for $790,000 on a jury verdict in his favor. Neiman–Marcus contends that Dworkin resigned and should be estopped to claim wrongful discharge, and that no evidence supports the award of damages. We affirm.

## I. FACTS

In early 1984, Carter Hawley Hale Stores, Inc. ("Carter Hawley") hired David Dworkin as president of its Neiman–Marcus division. His five-year employment contract included an "evergreen" provision; at the end of each year, another year was added to the back of the contract, thus giving Dworkin, in effect, a new five-year contract. The contract provided for a base salary and a number of other benefits including stock options, annual bonus potential, and various executive perquisites.

After Carter Hawley spun off its Neiman–Marcus division to a newly formed company, Neiman–Marcus Group, Inc. ("NMG"), Dworkin's relationship with Richard Marcus, the Neiman–Marcus chairman and chief executive officer, deteriorated, and by late October 1987, Dworkin was out as Neiman–Marcus president. He contends he was fired in breach of his employment contract. NMG contends he resigned pursuant to a resignation agreement.

For five months after Dworkin left, NMG continued to pay the amount of Dworkin's monthly base salary, $37,500. Dworkin then assumed the presidency of Bonwit Teller, a smaller retailing firm, and he wrote NMG demanding payment of damages for breach of his employment contract. NMG sued Dworkin in state district court seeking a declaratory judgment that a "resignation agreement"[1] between the parties was valid or, alternatively, for a money judgment for NMG's payments to Dworkin. Dworkin removed the case to federal court and filed a separate action alleging breach of contract and various torts. The cases were consolidated and tried, and the jury returned a verdict finding that NMG had breached the employment contract by discharging Dworkin and that Dworkin sustained damages in the amount of $790,000. NMG filed motions for judgment notwithstanding the verdict, contending that (1) Dworkin was estopped as a matter of law to deny that he resigned, and (2) that no evidence supported the jury award of damages. The district court denied the motions, NMG appeals, and we affirm.

## II. DISCUSSION

### A. *Estoppel.*

NMG attempts to circumvent the jury finding of wrongful discharge[2] by arguing that Dworkin's acceptance of benefits after leaving the company estops him as a matter of law to deny that he resigned. We disagree.

■ NMG has two problems: (1) the jury rejected its contention that the parties changed their contract positions by agreement in late 1987; and (2) because Dworkin was paid in 1988[3] only what the contract required, NMG can show no change of position, reliance, or prejudice. NMG argues that it paid Dworkin in 1988 under the impression that he had resigned and that their 1987 agreement provided for payment only until Dworkin obtained new employment. NMG thus tries to conform its contractual liability to its own wishful impres-

---

1. NMG contended at trial that a letter written by Richard Marcus and read to Dworkin established the terms of a resignation agreement. The letter briefly outlined the financial aspects of the parting, and concluded, "Let's discuss Monday." Dworkin rejected the terms of the letter, and never signed any agreement or release.

2. The jury received two interrogatories, one concerning whether NMG had breached Dworkin's employment contract, and one concerning Dworkin's damages if a breach were found. Concerning estoppel, the trial court instructed the jury as follows: "If you find that Mr. Dworkin accepted and retained compensation or other benefits from the Neiman–Marcus Group knowing them to be paid pursuant to an agreement concerning his resignation from employment, you should find that he did resign, whether or not he subjectively wished to leave the employment of the Neiman Group." NMG does not contest the instructions or the interrogatories. It only claims that the evidence warrants estoppel as a matter of law.

3. The record indicates that Dworkin continued receiving (1) his base salary through March 1988, when he began working for Bonwit Teller; (2) medical and insurance benefits through June 1, 1988; and (3) other benefits such as store discounts and club memberships through November 30, 1987.

sions. The closest NMG comes to an equitable estoppel is the variant known as quasi estoppel, which the original contract forecloses.

■ Quasi estoppel "was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position." *Stimpson v. Plano Indep. School Dist.*, 743 S.W.2d 944, 946 (Tex.App.—Dallas 1987, writ denied). "Quasi-estoppel differs from equitable estoppel or estoppel in pais in that quasi-estoppel requires no concealment or misrepresentation of existing facts on the one side, and no ignorance or reliance on the other." *Arrington v. County of Dallas*, 792 S.W.2d 468, 472 (Tex.App.—Dallas 1990, writ denied).[4]

To create a quasi estoppel, NMG would have to show that Dworkin can be equitably charged with choosing to accept benefits in a manner genuinely inconsistent with his subsequent claim. *See El Paso Nat. Bank v. Southwest Numismatic Invest. Group*, 548 S.W.2d 942, 948 (Tex.Civ. App.—El Paso 1977, no writ) (quasi estoppel based on concept of election). But there is no inconsistency here, and Dworkin's contractual protection distinguishes this case from the cases upon which NMG principally relies for its estoppel argument. *See Hurt v. Standard Oil Co.*, 444 S.W.2d 342 (Tex.Civ.App.—El Paso 1969, no writ) (employee estopped to contend he had not retired where he received substantial retirement benefits); *Allen v. Dempster Mill Mfg. Co.*, 402 S.W.2d 809 (Tex.Civ.App.—Amarillo 1966, writ ref'd n.r.e.) (employee estopped to demand written notice of contract cancellation when he signed notice of his retirement and accepted monthly retirement checks).

In both *Hurt* and *Allen*, unlike the present case, the employer began with control of the employment relationship. In *Hurt*, the court declined to find anything other than a terminable at-will employment, and the employee's receipt of retirement benefits simply confirmed the propriety of the binding termination. 444 S.W.2d at 346–47. In *Allen*, the employee had reached retirement age, but the employer deferred retirement for a year under a contract subject to cancellation by either party upon written notice. 402 S.W.2d at 809. Upon terminating the employee after seven months, the employer failed to give written notice, but the employee signed a notice of his retirement and accepted monthly retirement checks. *Id.* at 810. The written retirement notice and the receipt of benefits effectively cured the technical lack of written cancellation notice. *See id.* In both cases, the employee's conduct simply converted the employer's general control of continuing employment into an equitably binding arrangement between the parties.

In this case, Dworkin retained his contractual rights. NMG's wishful thinking to the contrary will not dissolve rights expressly secured by contract. *Cf. American Ins. Co. v. First Sav. & Loan Ass'n*, 434 S.W.2d 170, 175 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.) ("First Savings was not estopped. American was self-deluded."). The fact that NMG ardently wished to substitute a resignation agreement, express or implied, for Dworkin's valid employment contract does not create an estoppel.[5] *See Maryland Casualty Co. v. United States*, 169 F.2d 102, 113 (8th Cir.1948) (where contract was unambiguous and complete, workers not estopped to deny that second contract was real contract, though workers kept second contract

---

4. Equitable estoppel, or estoppel in pais, requires (1) a material misrepresentation (or concealment) (2) made with actual or constructive knowledge of the true facts, (3) with intent that the misrepresentation be acted upon by (4) a party without knowledge or means of knowledge of the true facts, (5) who detrimentally relies or acts on the misrepresentation. *Gulbenkian v. Penn*, 151 Tex. 412, 418, 252 S.W.2d 929, 932 (1952).

5. NMG correctly observes that estoppel does not necessarily depend upon the existence of an agreement, and that any type of misleading conduct may form the basis for an estoppel. However, Dworkin's contract had a substantial bearing on the conduct NMG cites as a basis for estoppel. We need not find a resignation agreement to find an estoppel, but nor may we ignore the significance of the original employment agreement.

without signing it or expressing objections to it).

NMG cites *Widener v. ARCO Oil & Gas Co.*, 717 F.Supp. 1211, 1217 (N.D.Tex.1989) for the proposition that failure to tender back the benefits Dworkin received precludes his suit for wrongful discharge. But the plaintiffs in *Widener* received benefits as distinct consideration for valid written releases. Plaintiffs alleged no fraud or undue influence in procuring the unambiguous release. The court held that even if the plaintiffs had not voluntarily and knowingly signed the releases, they knew what they had signed after receiving defendant's pleadings and should then have returned the money paid as consideration for the releases. *Id.* In the instant case, no such unambiguous transaction, much less a contract, triggers the equitable rule that a party cannot both retain benefits under a contract and escape the obligations imposed by that contract.[6]

### B. *Damages.*

■ An employee discharged in violation of an employment contract may not recover damages under Texas law if net earnings with the new employer approximately equal earnings during the prior employment. *Farley v. Universal Mills*, 116 S.W.2d 488, 491 (Tex.Civ.App.—Amarillo 1938, no writ). NMG contends that the evidence conclusively shows that Dworkin's earnings with his new employer, Bonwit Teller, actually exceeded his earnings with Neiman–Marcus, and that the trial court therefore erred in refusing NMG's motion for judgment notwithstanding the verdict.[7] Again we disagree.

■ The jury enjoys substantial discretion in awarding damages within the range shown by the evidence. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1260 (2d Cir.1987). This substantial discretion persists with evidentiary disputes, but a lack of credible evidence, or an array of confusing hypothetical figures, disables the jury's common sense upon which the justice system relies for discretionary damages awards. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). The valuation of the nonsalary benefits under Dworkin's contract introduces a more abstract calculation of damages than the direct comparison of base salaries. But the law condemns excessive speculation, not inferences demanded by the nature of the damages. *See Rodgers v. Fisher Body Div., G.M.C.*, 739 F.2d 1102, 1107 (6th Cir.1984) (condemning award of lost wages and fringe benefits where plaintiff's counsel computed possible damages on blackboard during closing argument to jury without having developed basis for figures during trial testimony), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985). While the jury may not pull figures out of a hat, its verdict does not fail for mere lack of exhaustive or dispositive evidence so long as a rational basis exists for calculation. *See F.H. Krear*, 810 F.2d at 1260.

6. The same distinction applies to the Michigan Supreme Court case that NMG submitted after oral argument, *Stefanac v. Cranbrook Educational Community*, 435 Mich. 155, 458 N.W.2d 56 (1990), which involved a written release reciting that consideration was paid. The consideration was paid and expressly identified as severance pay. Courts enforce written releases and require tender back of consideration thereunder because "[t]o hold otherwise would undermine the principle of the enforceability of contracts in the broadest sense." 458 N.W.2d at 66. NMG drafted a release but never submitted it to Dworkin, and Dworkin certainly never agreed to such a release. His employment contract persisted, which renders NMG's enthusias-

tic citation to cases extolling the sanctity of contracts somewhat perverse.

7. The parties do not dispute the jury instruction on calculation of Dworkin's damages. For the period before trial, damages equal the difference between the compensation owed Dworkin under his contract with Neiman Marcus and the compensation received by Dworkin from Bonwit Teller. For the period after trial through the unexpired portion of Dworkin's contract, damages equal the difference between the present cash value of the compensation owed under the Neiman Marcus contract and the present cash value of the compensation that Dworkin, in exercising reasonable diligence, was likely to earn from other employment.

Dworkin presented sufficient evidence of lost nonsalary benefits to provide a rational basis for the jury award. In 1984, 1985, and 1986, Dworkin earned annual compensation worth approximately $900,000 under his contract with Carter Hawley Hale. Dworkin testified that bonuses and stock options accounted for approximately $443,000 each year. The jury heard evidence that NMG bound itself to honor all obligations under existing contracts, and that Dworkin could anticipate receiving nearly $400,000 annually in nonsalary compensation from NMG. Both parties confirmed that nonsalary benefits constitute significant elements of executive compensation.

The jury heard further that Dworkin received nothing except his base salary from Bonwit Teller,[8] that the entity with which he entered into his contract was never actually formed, that the "equity program" was thus illusory for the foreseeable future, that Dworkin's new company faced severe cash flow difficulties, and that Dworkin had not, and could not expect to, receive any bonus. While the base salaries remained comparable, the jury could properly determine that Dworkin had lost the valuable nonsalary benefits he had enjoyed under his NMG contract, and assign a value accordingly. For the two-year period prior to trial alone, the jury heard sufficient evidence to surmise that Dworkin would have received approximately $1.8 million under his NMG contract, and that he received only his base salary from Bonwit Teller, totalling $760,000. The difference exceeds a million dollars. The jury awarded Dworkin $790,000.

NMG disputes Dworkin's nonsalary entitlement under the NMG contract, and characterizes the bonus and stock options as discretionary compensation that Dworkin would not in fact have received. NMG

raised this meaningful factual dispute at trial, but thereby only generated an evidentiary conflict within the province of the jury to resolve. NMG did not present evidence sufficient to establish here that Dworkin's total compensation would have been reduced by half. Given NMG's representations to its executives concerning compensation packages and the consistency of Dworkin's total compensation prior to leaving NMG, the jury heard sufficient evidence to conclude that Dworkin would have received some nonsalary compensation, and to assign a reasonable value to that compensation.

The manner of calculating bonuses involved performance by the company and performance by the executive. As to the latter, the record indicates that Dworkin had previously received favorable evaluations, and NMG introduced no evidence to suggest that Dworkin's evaluations would decline to the extent of precluding his participation in the compensation programs. Moreover, Dworkin received a report from NMG projecting the value of his compensation package as commensurate with his earnings under Carter Hawley Hale, and he was assured that the value of his nonsalary compensation would be as good if not better than the amounts he had received at Carter Hawley. The jury thus received sufficient evidence to project the value of Dworkin's lost compensation at NMG. *See Meyer v. W.R. Grace & Co.,* 421 F.Supp. 1331, 1335 (E.D.Pa.1976) (jury could properly determine bonus amount where plaintiff under new contract was told that incentive program would be equal to or better than prior program), *aff'd in part and rev'd in part without op.,* 565 F.2d 152 (3d Cir. 1977).

The stock options certainly elude precise valuation. But both parties agree

8. NMG argues that Dworkin received a "signing bonus" of $200,000 from Bonwit Teller, which should offset Dworkin's damages. While denominated a "commencement bonus" in the Bonwit Teller contract, the description following that label expressly indicates that the sum represents consideration for adverse relocation consequences, especially given the slump in the Dallas real estate market where Dworkin's

home was located, and not merely consideration for commencing employment as in the case of a pure "signing bonus." Without competent evidence by NMG disputing Dworkin's relocation expenses, the jury could infer that this payment need not figure in its calculation of damages. As of trial, Dworkin still owned his home in Dallas, though it had been on the market since late 1987 or early 1988.

that such compensation is extraordinarily valuable because the option allows the holder to control the realization of gain from appreciation of the stock over ten years without any downside exposure or out-of-pocket expense. The impossibility of exact valuation need not prevent the jury from assigning a reasonable value to compensation with undisputed worth in a compensation package. *Green Tree Acceptance, Inc. v. Combs*, 745 S.W.2d 87, 92 (Tex.App.—San Antonio 1988, writ denied) (no error to refuse new trial on jury's valuation of incentive stock options despite allegation of insufficient evidence for valuation). The jury award suggests, at most, a fairly conservative valuation of the stock options, and the record indicates that Dworkin could not expect to participate in any equity program at Bonwit Teller.

■ We find evidence in the record sufficient to uphold the jury verdict even without analyzing post-trial damages.[9] Dworkin submitted evidence of damages totalling nearly three million dollars. We cannot review the jury's exact computations, but must presume that the jury acted properly in reaching its verdict. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). We decide that the modest award of $790,000 certainly falls within the range of reasonableness established by the evidence.

The judgment of the district court is AFFIRMED.

---

**9.** Dworkin posits an additional $1.4 million in damages for the period after trial, and NMG disputes this figure in much the same way as it disputed the pre-trial damages.