**EVERETT CLIFTON, Plaintiff**

v.

**VOYAGER INC., CAPTAIN FRANK GARGAS, IN PERSONAM, DOES I-V AND THE M/V VOYAGER, HER ENGINES, BOILERS, NETS AND FISH CARGO, IN REM, Defendants**

High Court of American Samoa
Trial Division

CA No. 4-92

October 10, 1996

[REDACTED]

13

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Roy J.D. Hall, Jr.
 For Defendants, William H. Reardon

Order Granting in Part and Denying in Part Motion for New Trial:

## I. INTRODUCTION

On November 28, 1995, we issued our opinion and order finding defendant Voyager, Inc. ("the owner") liable under the Jones Act, 46 U.S.C. App. § 688, and the general maritime cause of unseaworthiness, and finding the owner and defendant *M/V Voyager* ("the vessel") (collectively "defendants") liable for unpaid maintenance and cure.[1] Under the Jones Act and unseaworthiness claims, we awarded plaintiff

---

[1] We found that the case, as pled, would not lie against defendant Captain Frank Gargas, the captain of the vessel. *See* 29 A.S.R.2d 82 (Trial Div. 1995).

14

Everett Clifton ("Clifton") $807,750 for lost earning capacity and disability plus $50,000 for pain and suffering. We awarded an additional $1,795.99 for unpaid maintenance and cure. We also awarded costs in the amount of $2,330.39. We set post-judgment interest to run at 6% from the date of the order. Defendants filed a motion for new trial.

## II. DISCUSSION

### A. Defendants' Reply Brief Will Be Struck

Defendants filed their motion for a new trial on December 8, 1995, and their supplemental memorandum on December 12, 1995. Clifton filed his response on January 9, 1996.[2] For purposes of this order, we will refer to Clifton's brief as a response, and defendants' subsequent brief as a reply. The hearing on this motion was held January 11, 1996. At the hearing, counsel for both sides agreed to waive oral argument and submit the motion on the briefs. We asked defendants' counsel whether he would like additional time to draft a reply to Clifton's response. He said that he would not. We urged defendants' counsel to at least take additional time to read Clifton's response. However, he said that was unnecessary, and that he was willing to submit the motion on the briefs as submitted. We took the matter under advisement at that time.

■ Six weeks later, on February 21, 1996, defendants filed a reply brief with the court, despite their earlier assurance that they would not. T.C.R.C.P. 59(c) appears to give us discretion over whether to allow the

---

[2] Clifton has styled his response brief as "Reply to Motion for New Trial." We wish to point out that this is not, in fact, a "reply" brief. A reply brief is that filed by a plaintiff replying to a defendant's answer or by an appellant replying to an appellee's response. *See* BLACK'S LAW DICTIONARY 1169 (5th ed. 1979); A.C.R. Rule 28(a)-(c); T.C.R.C.P. 7(a). Defendants have also mis-styled their reply brief as "Defendant's Response."

The distinction between a response and a reply brief is important because of the procedural limitations placed upon each. For instance, no reply brief is allowed in a trial court unless ordered by the court. *See* T.C.R.C.P. 7(a). In appellate court, response briefs are limited to a prescribed format, while reply briefs are not. *Compare* A.C.R. Rule 28(b), *with* A.C.R. 28(c). With regard to motions for new trial, it appears that the court rules prescribe certain time limits for motions and responses, but may allow replies only by leave of the court. *See* T.C.R.C.P. 59(b)-(c).

15

filing of a reply in a motion for new trial.[3] However, even without such discretion, we need not, and as a general rule will not, accept filings made after a matter has been submitted. This is particularly true where we specifically asked an attorney whether he would like additional time to make a filing, and he, in return, specifically answered that he would not. For these reasons, defendants' reply brief will be struck.

## B. Standard of Review

■■■ The decision to hold a new trial is within the discretion of this court. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278, 106 L. Ed. 2d 219, 240 (1989). We grant a motion for a new trial only where the moving party can show that the original decision is contrary to the clear weight of the evidence. *See, e.g., Day v. Amax, Inc.*, 701 F.2d 1258, 1263 (8th Cir. 1983). Of course, on a motion for a new trial, we will not consider arguments that the moving party failed to raise during the original trial. *Olaotoa v. Bartley*, 3 A.S.R.2d 21, 22 (Land & Titles Div. 1986); *see also Vaimaona v. Tuitasi* (Mem.), 13 A.S.R.2d 76, 82 (Trial Div. 1989).

## C. Liability

Defendants have continually conflated the concepts of negligence and unseaworthiness in their brief.[4] However, as we discussed in our opinion and order, Jones Act negligence and unseaworthiness are two separate and distinct claims. Thus, although defendants lump them together in their arguments, we must deal with each concept separately.

### 1. Jones Act Negligence

---

[3] Rule 59(c) states that "[t]he court may permit reply affidavits." Because the sentence immediately preceding this speaks in terms of "opposing affidavits and memorandum," we assume that we would also have discretion over whether to allow the filing of reply memorandum. We do not know of any instance where such permission has been denied. However, the ultimate question of our discretion need not be decided today, since we will strike defendants' reply brief on other grounds.

[4] The first sentence of defendants' argument concerning negligence and unseaworthiness states that "It was not negligent or unseaworthy for the vessel's net to become caught in the vessel's propeller." Def.'s Br. at 5. Besides using the word "unseaworthy" in a grammatically incorrect manner, this sentence demonstrates how defendants have continually dealt with the two concepts as if they were one concept with similar principles of application.

16

We found that Clifton proved both elements of a Jones Act negligence claim: (1) that there was a negligent act by the owner, and (2) that there was a but-for causal connection between the act and the injuries sustained. *See* MARTIN J. NORRIS, THE LAW OF SEAMEN § 30:34, p. 458. Defendants challenge our finding of (a) negligence (a breach of a legal duty) and (b) our finding of actual, or "but-for" causation.

## a. Jones Act Negligence: Duty and Breach of Duty

■ Defendants allege that Clifton did not meet his burden of proving the existence of defendants' duty and breach of duty. The Jones Act and interpretive case law, not a plaintiff, establish a defendant's immutable duty of care to the plaintiff. The duty of care that employers owe to seamen under the Jones Act is identical to the duty of care that employers owe to employees under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. Sections 51 et seq. *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 523, 1 L. Ed. 2d 511, 514 (1957). As we stated in our original opinion and order, the duty of care employers owe under the FELA is not merely a duty to exercise reasonable care, as in the typical negligence suit, but is rather a duty to exercise "great care". See Op. & Order at 11 (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 371 (5th Cir. 1969); *Nelsen v. Research Corp. of Univ. of Hawaii*, 805 F. Supp. 837, 848 (D. Hawaii 1992)). Under the Jones Act, the owner owed Clifton a duty to exercise great care in the instant case.

■ While the question of duty is a question of law, the issue of breach of duty is a question of fact. "[D]eterminations of negligence in admiralty cases are findings of fact which will be given application unless clearly erroneous." *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir. 1995) (quoting *Hasbro Industries, Inc. v. M/S St. Constantine*, 705 F.2d 339, 341 (9th Cir. 1983), *cert. denied*, 464 U.S. 1013, 78 L. Ed. 2d 717 (1983)). In general, "fact finding does not require mathematical certainty. [Factfinders, whether jurors or judges] are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances *from which inferences can fairly be drawn.*" *Schultz v. Pennsylvania Ry. Co.*, 350 U.S. 523, 100 L. Ed. 2d 668, 671 (1956) (emphasis added). In the context of a Jones Act claim, determining that a factual conclusion is "clearly erroneous" is particularly difficult, because under the Jones Act "the burden of proof is much less than the burden required to sustain recovery in ordinary negligence actions." *Nelsen*, 805 F. Supp. at 848.

Clifton testified that the operator reversed the vessel's engines and caused the fishing net to become entangled with and fused to the vessel's

propeller. . As a matter of common sense, we believe that when a fishing net is trailing the vessel in water, an operator exercising "great care" would not reverse the engines. Defendants' own witness admitted that such an occurrence is extremely rare. From this circumstantial evidence, this court reasonably inferred that Clifton met his burden of proving that the owner failed to exercise great care when its agent allowed the net to become entangled in the vessel's propeller. We decline to hold that these factual findings were clearly erroneous.

■ Defendants charge that this court improperly imposed on defendants a burden of disproving the elements of Clifton's claim. However, defendants misunderstand the Court's approach to the evidence. The evidentiary value of a plaintiff's case is always buttressed by the absence of credible evidence to the contrary. We found negligence not *because* defendants failed to disprove elements of Clifton's claim, but because Clifton's evidence, as viewed *in light of* defendants' failure to present contradictory evidence, supported such a finding.

Our earlier statements that "[w]e are unable to understand how a fishing net becomes severely entangled around a vessel's propeller in the absence of negligence," 29 A.S.R.2d 82 at 91, and that "[t]his case approaches one of *res ipsa loquitor*," *Id.*, do not evince our intent to shift the burden to a defendant or to apply the doctrine of *res ipsa loquitor*. Rather, these strong statements simply reflect our supreme confidence in our finding that the owner was negligent.

**b. Jones Act Causation**

Defendants argue that "any negligence . . . connected to the[] net being caught in the propeller had no causal effect on plaintiff's claimed injuries which occurred when plaintiff was assisting in releasing the net." Def.'s Brief at 7. (capital letters omitted). In particular, defendants protest that this court did not consider proximate causation, i.e., the question of whether it was foreseeable that the owner's negligence would play a part in producing the injuries. Defendants cite cases from general maritime law. As this court has already stated, however, the Jones Act does not follow general maritime law. The Jones Act does not require a showing of proximate causation, but only a showing that the defendant's breach of duty played any part, no matter how small, in bringing about or actually causing the injuries. *See* 29 A.S.R.2d at 92 (citing *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506, 1 L. Ed. 2d 493, 515 (1957) (FELA); *Belanger v. Cenac Towing Co.*, 1989 U.S. Dist. LEXIS 8755 (E.D. La. 1989)); *see also Chisolm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 63 (5th Cir. 1982).

18

■ Since the question of but-for causation under the Jones Act is a question of fact, *see* MARTIN J. NORRIS, THE LAW OF SEAMEN § 30:37, at 505-06, a factfinder's conclusions with respect to causation must stand unless clearly erroneous. *McAllister v. United* States, 348 U.S. 19, 20, 99 L. Ed. 20, 24 (1954); *Exxon*, 54 F.3d at 576. Proving cause in fact is simply a matter of proving that the defendant's act contributed to the string of events leading to the eventual injuries. The question is often phrased as: "But for the defendant's acts or omissions, would the plaintiff have been injured?"

■ Defendants state that

> the evidence establishes that the net became entangled in the propeller and the vessel then came to a stand still. As of that time, there was no claimed injuries to Plaintiff. Therefore, the condition of the vessel at that time [or the negligence leading to it] did not cause any injury to Plaintiff.

Def.'s Br. At 8. However, "[n]earness in time or space is not the proper test of cause in fact." 57A AM. JUR. 2D *Negligence* § 465, at 445. A causal chain can continue for a great deal of time into the future or through many intervening occurrences. *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928). Thus, if A causes B, B causes C, and C causes D, then A, B and C are *all* causes in fact of D, though each may not necessarily be a proximate cause. *See* WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 41, at 237 (4th ed. 1971); 57A AM. JUR. 2D *Negligence* § 454, at 437.

In the instant case, the owner's negligence was the first in a string of events leading to Clifton's injuries. Therefore, the court did not err in its finding of causation under the Jones Act. Whether it was foreseeable, at the time of the owner's negligence, that Clifton would suffer a hand injury from the owner's negligence is not a relevant inquiry under the Jones Act.

## 2. Unseaworthiness

In our original opinion and order, we found as a matter of fact that the vessel was unseaworthy, and that the vessel's unseaworthiness was an actual and proximate cause of Clifton's injuries. Because defendants have conflated the issues of negligence and unseaworthiness, we are unsure whether defendants are attacking the court's factual finding that the vessel was unseaworthy. For the record, we find no clear error in the conclusion that a vessel that has no functioning propeller and is "dead in

the water' is unfit for its intended purpose. *See* 29 A.S.R.2d 82 at 89; *Nelsen*, 805 F. Supp. at 850.

Defendants have, however, gone to great lengths to challenge our factual findings with respect to causation under the unseaworthiness claim.

In a cause of action due to unseaworthiness, "a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1354 (5th Cir. 1988). We reaffirm the conclusion that the vessel's unseaworthiness (a) actually and (b) proximately caused Clifton's injuries.

First, after employing the cause in fact analysis contained in the discussion of the Jones Act above, we have no trouble affirming the earlier finding that the vessel's unseaworthiness was a cause in fact of Clifton's injuries. The unseaworthiness was a "substantial part" of the chain of events that led to his injuries. In fact, it was the second in a chain of events initiated by the owner's negligence, which we also have deemed to be a cause in fact. But for the inability of the vessel to function properly, Clifton would not have sustained his injuries.

■ In unseaworthiness cases, the plaintiff must not only establish cause in fact, but also proximate cause, i.e., "that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.,* 845 F.2d at 1354. The question of proximate cause examines whether a cause is so attenuated in time or space, or whether an act or actor has intervened in the causal chain, so as to relieve the defendant of liability. The requirement of proximate causation stems from the belief that imposing liability on every cause in fact can violate "common sense, logic, precedent, fairness, and a 'rough sense of justice.'" 57A AM. JUR. 2D *Negligence* § 482, at 464.

Defendants argue that "[t]he actual force causing the claimed injury was the work (i.e., the cutting away at the net), not any accident relating to the net becoming caught." However, Prosser states that it is "obvious that if a defendant sets a fire which burns down the plaintiff's house, no court in the world will relieve him of liability upon the ground that the fire, rather than his act, was the nearest or the next cause of the destruction of the house." PROSSER, *supra*, § 42, at 246-47. Thus, in the instant case, we categorically reject the notion that the work on the net was an independent intervening cause that should absolve defendants, when the vessel's unseaworthiness caused the need for the work in the first place. Clifton's injuries were a direct result of the vessel's unseaworthiness.

■ Next, defendants contend that Clifton's injuries were unforeseeable. The foreseeability question restricts the imposition of liability to cases in which the injuries to the plaintiff are the natural and reasonably predictable consequences of a negligent action, or in this case, of a ship's unseaworthiness. It is clearly foreseeable that a crewmember must repair a vessel when it is damaged to the point of being "dead in the water." Volunteering to assist in such repairs is "a normal response to the stimulus of a dangerous situation." *See New York Cent. Ry. Co. v. Brown,* 63 F.2d 657, 658 (6th Cir. 1933). Thus, Clifton's injuries were a foreseeable result of the unseaworthy condition of the vessel, which had a fishing net tangled about its propeller.

*Chisholm v. Sabine Towing and Trans. Co.,* 679 F.2d 60 (5th Cir. 1982), the case that defendants cite and ultimately misread, does not challenge the factual findings in this case. In that case, the plaintiff injured his back throwing unsecured scrap metal overboard. In one part of the opinion, the circuit court denied recovery for the plaintiff's unseaworthiness claim on the ground that the injury did not occur while the plaintiff was working to remedy the vessel's unseaworthy condition. *Id.* at 63. However, the case at hand is inapposite. Clifton was working to free the net from the vessel's propeller; unlike the plaintiff in *Chisolm,* Clifton was trying to remedy the unseaworthy condition when he sustained his injuries. "The danger which invited the response was the cause of the injury." *Id.* Though *Chisolm* is factually distinguishable from the instant case, our opinion is fully consistent with the law of *Chisolm.*

■ In sum, the question of proximate cause considers temporal and spatial proximity, incorporates the foreseeability of a plaintiff's injury, and distinguishes natural and ordinary consequences from extraordinary consequences. This court originally found that the vessel's unseaworthiness was close in time and space to Clifton's injuries, and that his injuries were a foreseeable, ordinary, and natural result of the vessel's unseaworthiness. After further review, we find that those factual findings are not clearly erroneous.

### 3. Medical Causation

Defendants also assert that, as a medical matter, Clifton's injuries could not have been caused by his work in freeing the net from the propeller.[5]

---

[5] Medical causation is really part of the cause in fact and proximate cause inquiries discussed above. However, because the defendants have dealt with it at length in a separate section of their brief, we have also decided to deal with it separately here.

21

At trial, we found that Clifton had established medical causation, based upon the expert evidence presented by Doctors Vineyard and Tuato'o. Defendants challenge our finding of fact with a barrage of misrepresentations and new evidence.

### a. Qualifications of the Expert Witnesses

 "A trial court has broad discretion concerning the admissibility or exclusion of expert testimony . . . ." *EW Truck & Equipment Co. v. Coulter*, 20 A.S.R.2d 88, 92 (App. Div. 1992) (citing *Reno-West Coast Distribution Co. v. Mead Corp.*, 613 F.2d 722 (9th Cir. 1979), *cert. denied*, 444 U.S. 927 (1979)). Despite this broad discretion, defendants object to our acceptance of the expert testimony at trial because it does not follow the criteria for admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, ___ U. S.___, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). However, defendants did not raise the issue of the *Daubert* criteria at trial. We will not accept arguments on issues raised for the first time in a motion for a new trial if they could have been properly raised at trial. *Moea'i v. Alai'a*, 12 A.S.R.2d 91, 93 (App. Div. 1989). This is true even in the case of an "interesting and possibly important argument" such as the one raised here. *See Olotoa v. Bartley*, 3 A.S.R.2d 21, 22 (Land & Titles Div. 1986).

Clifton offered, and the court accepted, the doctors' expert testimony without objection or challenge from defendants. Thus, defendants' belated *Daubert* argument will not be considered in this motion.[6]

### b. Challenge to Expert Evidence

In addition to challenging the qualifications of the expert witnesses, the defendants now also challenge the evidence the experts presented. Defendants have attempted to disprove medical causation by quoting medical definitions for carpal tunnel syndrome ("CTS") which have been accepted by other courts. *See* Def.'s Br. at 10. This new evidence does not advance defendants' cause.

First, defendants knew that evidence was to be presented at the trial, and not afterward. They had every opportunity to contradict the testimony that Clifton's work in freeing the net caused his CTS. They may not now

---

[6] We wish to make clear that we have neither accepted nor rejected the *Daubert* criteria. Our ruling is based upon the defendants' failure to raise the argument at trial. Thus, the question of whether we would apply the *Daubert* criteria if they were properly raised at the appropriate time during trial remains open.

present evidence that was available at the time of the trial to challenge the Court's factual findings with respect to causation.

Second, even if defendants had presented this evidence at trial, we conclude that their evidence would not have affected, and does not affect, our factual determination on causation. Defendants aver that "[CTS] could not have been caused by the one-day work performed by Plaintiff in releasing the net from the propeller." Def.'s Br. at 10. However, their citations do not unequivocally stand for this proposition. Their sources define CTS as "commonly," but not exclusively, "caused by occupational activities which require 'repeated flexion, pronation, and supination of the wrist.'" *Melendez*, 1990 U.S. App. LEXIS at *10. This definition does not indicate the minimal duration of repetitive motion necessary to cause CTS, nor does the definition state that repetition is necessary in all cases of CTS. The definition does not preclude the possibility that Clifton's efforts to free the net could lead to CTS.

Clifton's expert witnesses told us that his efforts could and did lead to CTS. Where a factfinder makes a decision based on "one or two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 529-30 (1985). Thus, we conclude that there was no error in our finding of medical causation.

### 4. Inevitable Hazards

Defendants posit that an "inevitable hazards" defense should preclude liability in this case. The case that defendants cite, *Massey v. Williams McWilliams, Inc.*, 414 F.2d 675 (5th Cir. 1968) states that "there are inevitable hazards--some of a severe nature--in the calling of those who go down to sea in ships, hazards which *when not occasioned by negligence or unseaworthiness* have to be borne by those who follow the calling." *Id.* at 678 (emphasis added). Thus, even accepting that the inevitable hazards "doctrine" for which defendants argue is not an inapplicable assumption of risk argument, *see* 29 A.S.R.2d at 94, it is still no defense where, as here, a court has found negligence and unseaworthiness.[7]

### 5. Primary Duty Rule

---

[7] Furthermore, even if such an affirmative defense did exist, the rare occurrence of entangling a net within the propeller of a vessel cannot be considered "inevitable."

23

In our opinion and order, we noted that defendants "evince[d] a fundamental misunderstanding of th[e] [primary duty] rule." 29 A.S.R.2d at 92-93. We stated the correct rule, and defendants' new arguments do not sway us from our convictions that we correctly interpreted this straightforward doctrine.

## 6. "Warranty of Being Fit for the Voyage"

Defendants once again raise the argument that a seaman owes a shipowner a "warranty of being fit for the voyage and of being of normal agility and coordination." Def.'s Br. at 14. In our opinion and order, we noted that no such warranty exists and castigated defendants for the manner in which they had presented the argument. *See* 29 A.S.R.2d at 94 & n.5.

In their latest brief, defendants continue to claim that a warranty of fitness for duty exists and cite three cases for the proposition. None of these cases discuss the concept of a warranty of fitness for duty. *See Gibson v. International Freight Corp.*, 173 F.2d 591 (3d Cir. 1949); *Bilger v. Maritime Overseas Corp.* 304 F. Supp. 1024 (N.D. Cal. 1969); *Curry v. United States*, 327 F. Supp. 155 (N.D. Cal. 1971). In fact, we have never even seen that language--"warranty of fitness for duty"--except in defendants' briefs.

## 7. *Gottshall*

Additionally, defendants take issue with our legal reasoning on the issues of causation, medical causation and the "warranty of fitness for duty" by claiming that we have relied upon overruled law. Specifically, they claim that a case we cited in our opinion, *Nelsen v. Research Corp. of the Univ. of Hawaii*, 805 F. Supp. 837 (D. Haw. 1992), was overruled by the Supreme Court in *Consolidated Rail Corp. v. Gottshall*, ___U.S.___, 114 S. Ct. 2396, ___L. Ed. 2d___ (1994). However, *Gottshall* does not explicitly or implicitly overrule, or even mention *Nelsen*.

Defendants, therefore, have failed to show clear and prejudicial error warranting a new trial with respect to liability.

## D. Damages

Defendants also take issue with our award of damages. The measure of damages is a question of fact. *Johnson v. Offshore Express, Inc.*, 845 F.2d at 1356. A trier of fact enjoys substantial discretion in determining the amount of damages to award. *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990). The factfinder is not required to calculate damages with mathematical precision, *Cunningham*

24

*v. City of Overland*, 804 F.2d 1066, 1070 (8th Cir. 1986), and a reviewing court may only modify a damages award if the award does not have a rational basis. *Dworkin*, 919 F.2d at 372.

We believe that our awards for pain and suffering, medical costs, and maintenance and cure have a rational basis. However, after further review of case law on the issue of lost future wages, we are left with the definite and firm conviction that in our original opinion and order, we committed a mistake in the manner in which we calculated damages for Clifton's lost future wages. Where the trier of fact has not properly considered factors enunciated in judicial precedent, the findings will be clearly erroneous. *Cf. Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 492 (5th Cir. 1985).

The goal in awarding damages for lost future wages is to replicate as accurately as possible the injured plaintiff's lost stream of future income. *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 830 (11th Cir.), rehearing denied 763 F.2d 419 (1985) (citing *Jones & Loughlin Steel Corp. v. Pfeifer*, 462 U.S. at 533-38, 76 L. Ed. 2d at 780-84). Lost stream of income is composed of the difference between what the injured party would have earned had he not been injured and what his forecasted actual earnings will be, given his injuries. *Id.*

We now believe we erred in our previous calculation of Clifton's total expected future wages as an uninjured seaman. As defendants correctly point out, we did not use Clifton's actual earnings at the time of the accident as the base from which to determine Clifton's future earning capacity but for his injuries. We recognize that this approach was consistent with the approach of Louisiana state courts in *Landry v. Melancon*, 558 So.2d 1143 (La. App. 1989), and *Flose v. Fakouri*, 371 So.2d 1120 (La. 1979). However, after further research and consideration, we choose to follow the approach articulated by the Fifth Circuit in *Hernandez v. M/V Rajaan*, 841 F.2d 582 (5th Cir. 1988), *corrected on other grounds on denial of rehearing*, 848 F.2d 498, *cert. denied, Dianella Shipping Corp. v. Hernandez*, ___U.S.___, 102 L. Ed. 2d 562, *cert. denied*, ___ U.S.___, 102 L. Ed. 2d 970 (1988); *see also Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 621 (E.D. La. 1988). The *Hernandez* court rejected the expert's lost wage calculations because they were based on an uninjured longshoreman's average annual salary; instead the court used as a basis for calculating future earning capacity the plaintiff's actual earnings at the time of the incident, which were substantially less than the average annual salary because the plaintiff was only a part-time longshoreman. 841 F.2d at 587.

We believe that the *Hernandez* opinion, in essence, incorporates the concept of foreseeability the Supreme Court articulated in *Jones &*

25

*Loughlin Steel Corp. v. Pfeifer*, 462 U.S. at 536, 76 L. Ed. 2d at 783 (authorizing adjustments in the calculations of future earning capacity for "foreseeable" promotions and "foreseeable" productivity growth). Based on the *Jones & Loughlin Steel Corp.* and *Hernandez* decisions, we believe that it is generally foreseeable that an uninjured plaintiff will continue his employment at his current wage rate, in his current position, and for the same number of hours per annum. Just as a court may consider foreseeable raises and promotions in determining future earning capacity, courts should also be able to consider foreseeable upgrades in employment status from an unemployed or part-time employee to full-time employee--but only if the evidence at trial "reliably demonstrate[s]" that it is *foreseeable* that the individual would have achieved full-time employment status at a particular juncture. *Jones & Loughlin Steel Corp. v. Pfeifer*, 462 U.S. at 535, 76 L. Ed. 2d at 782. While an individual's big break could be "right around the corner", a court cannot, absent reliable evidence presented at trial to the contrary, speculate that the individual would be employed more often than he was employed during the year prior to the injury.

In the instant case, while there *was* testimony from Clifton and the vessel's captain to support the conclusion that if he had not been injured, Clifton would be promoted to an assistant engineer in 10 years, there was no testimony to support the notion that Clifton's work schedule was going to involve more than one trip per year.[8] In a real sense, we determined what Clifton uninjured *could possibly have* earned in the future, not what he *would have* earned based on the evidence reliably demonstrated at trial. Therefore, in our original opinion and order, we should have judged Clifton's future earning capacity from his actual earnings during the year prior to the injury. We purport to do so now.

---

[8] Without defining the parameters of the category of items that enhance the foreseeability of full-time employment, we note that if there is evidence that the most recent year of sporadic or no employment is an anomaly due to illness, sabbatical, schooling, or the like, then a court might have reason to believe that a return to full-time employment would be foreseeable. Moreover, if a neophyte's brief work history shows a steady, but marked increase in the number of hours worked, then a court may have reason to conclude that it is foreseeable that the individual's career will soon progress to full-time employment. In the case at hand, however, there is no evidence that the year prior to Clifton's injuries was anomalous, nor is there any evidence that Clifton, who worked on three trips in six or seven years, was about to work more regularly. We have no evidence from which to infer that full-time employment was in Clifton's foreseeable future.

26

Defendants correctly point out that the evidence at trial indicated that Clifton was earning at the time of the accident, at most, an annual salary of $4,000: he only went on one trip during the previous calendar year, a trip that could, at best, bring in 1000 tons of fish;[9] at $4 per ton, his income from his one annual trip was, at best then, $4,000. We have no other evidence that Clifton earned income from any other employment. Therefore, for the purposes of computing lost wages, we should have concluded that Clifton would have earned $4,000 per year as a fisherman.

From credible evidence at trial, we concluded that Clifton was on track for a promotion to assistant engineer after 10 years, a promotion that would have increased Clifton's annual gross income to $11,000 ($11 per ton on a ship that catches at most 1000 tons of fish each trip, working one trip each year) for the remaining 29 years of his working life. Thus, considering as we must the increase in earnings Clifton would have obtained as a result of reliably demonstrated promotions, *Jones & Loughlin Steel Corp.*, 462 U.S. at 535, 76 L. Ed. 2d at 782, we should have concluded that he would have earned $11,000 per year as an assistant engineer.

Further review of the trial record compels us not only to reconsider our valuation of the amount Clifton would have made but for the injuries, but also to reconsider our valuation of the amount Clifton is earning, or will likely earn, after his injuries. In our original order and opinion, we took judicial notice of figures that were not contained in the trial record, but were from the American Samoa Statistical Digest for 1992. Based upon the figures contained therein, we estimated that Clifton's earning potential was reduced by 45%. Defendants correctly point out that we must base our calculations on the evidence, and not speculation. *See* Def.'s trial brief at 19-20.

We should have given adequate weight to Clifton's own testimony that he currently earns $7 per hour at Net Systems in Washington State. *See Deakle v. John E. Graham & Sons*, 756 F.2d 821, 831 (11th Cir. 1985) ("[the court] can look to his proven post-injury earnings for a figure below which the jury could not have reasonably chosen amounts intended to represent his expected annual salary installments, absent reliable evidence that [the plaintiff's] condition will deteriorate"); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1143-44 (7th Cir. 1985), *cert. denied* 475 U.S. 1094, 89 L. Ed. 2d 892 (1985) (requiring, in

---

[9] The evidence at trial indicated that fishing vessels typically have an annual catch of 5000 tons and make between five and 10 trips per year. Examining the evidence in the light most favorable to Ciflton, the largest amount of fish a vessel could gather on one trip is 1000 tons.

27

lost wages claims, that the court consider the injured plaintiff's opportunities in other markets). At a wage rate of $7 per hour, Clifton is now annually earning $14,616 for full time employment ($7 per hour x 2088 work hours in a calendar year). Thus, even assuming that he receives no fringe benefits, raises or promotions, Clifton will make more in his current position at Net Systems than he would have made as an uninjured fisherman ($4,000 per year) or as an uninjured assistant engineer ($11,000 per year). In short, Clifton will not suffer a loss in wages in the future because of the injuries that he sustained.

We now hold that the original damages award for lost wages of $807,750 did not have a rational basis.

Because Clifton has not had opportunity to challenge the accuracy of these findings, and because counsel for both parties created a poor factual record on the issue of lost wages, we hold further that Clifton may either accept a remittitur in the total amount of $807,750, or he may opt for a new trial on the issue of damages for lost wages under the dictates of *Deakle, Hernandez* and *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (en banc), *cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd*, 467 U.S. 1252, 82 L. Ed. 2d 842 (1984) *(Culver II)*. We emphasize that the scope of the new trial is limited exclusively to the issue of damages for lost wages, for we find no clear error as to the question of defendants' liability or as to the questions of damages for pain and suffering and maintenance and cure.

### III. CONCLUSION

The motion for a new trial is granted in part and denied in part. Clifton may either acquiesce in the remittitur of $807,750, or he may submit to a new trial on the issue of damages for lost wages. If a new trial is held, the parties may try only the issue of damages for lost wages; neither party shall address any other issues of law or fact involved in this case.

It is so ordered.